UNITED STATES OF AMERICA
DISTRICT COURT OF MASSACHUSETTS

_____

| | |
|---|---|
| J.S.H., in her Individual Capacity, and as the Legal Guardian and on Behalf of a Minor Child, known as G.H., *Plaintiffs,* v. <br><br> Alice Newton, M.D., Jane and/or John Doe, and Massachusetts General Hospital, <br><br> Defendants | ) ) ) ) ) ) ) ) ) ) ) ) |

Civil Action No. 4:21-cv-40086

**COMPLAINT**

THE PARTIES

1. The Plaintiff, G.H., is a male minor child, currently twelve (12) years old, who resides in the Town of Clinton, located in Worcester County, Massachusetts.

2. The Plaintiff, J.S.H., is G.H.'s biological mother and his legal guardian.

3. The Defendant, Alice Newton, is a medical doctor who maintains a principal place of business in Boston, Massachusetts at Massachusetts General Hospital ("MGH"), located at 55 Fruit Street in Boston, Massachusetts.

4. The Defendant(s), Jane and/or John Doe, are one or more employees of MGH whose identity is, as of yet, unknown to the Plaintiffs.

5. The Defendant, Massachusetts General Hospital, is a nonprofit, charitable organization that maintains a principal place of business at 55 Fruit Street in Boston, Massachusetts. At all times relevant to this Complaint, MGH was, and still is, the recipient of federal funds.

JURISDICTION AND VENUE

6. Jurisdiction is proper in this Court the Plaintiffs assert claims under 42 U.S.C. § 12101, et

   seq. (the amended "Americans with Disabilities Act" and/or "ADAA" ), Section 504 of the

   Rehabilitation Act of 1973, 29 U.S.C. § 794 ("Section 504"), and 42 U.S.C. § 1985.

7. Venue is proper in this judicial district because a substantial portion of the nexus of facts

   giving rise to this cause of action occurred in Worcester County.

FACTS

G.H.'s Background

8. G.H. is a minor child who suffers from serious and potentially fatal medical illnesses,

   which render him completely disabled – he requires mechanical assistance to oxygenate

   and take nourishment, has poor muscle tone, and suffers from a complex constellation

   of multi-systemic symptoms.

9.  At one point in time, G.H.'s clinical team suspected that one substantial cause of his

   confounding constellation of symptoms was "Mitochondrial Dysfunction."

   Mitochondrial disease, Mitochondrial Disorder, and Mitochondrial Dysfunction are all

   commonly referred to as "Mito" and the terms can be used nearly interchangeably,

   although there are subtle, but important, distinctions.  In this Complaint, the term

   "Mito" can be understood to mean mitochondrial dysfunction in general.

10. A commonality among all Mito conditions is that the disease, or condition, adversely

   affects the mitochondria, which produces energy in our cells.  They are long-term, often

   genetic disorders.  Each cell in the human body contains approximately 5,000

   mitochondria, and their function is to process oxygen and convert materials from food

and nutrition into energy; approximately ninety percent of the energy needed for proper body function is produced by mitochondria.

11. Mitochondrial dysfunction occurs when the mitochondria do not work as well as they should due to another disease or condition. Many conditions can lead to secondary mitochondrial dysfunction and affect other diseases, including Alzheimer's disease, muscular dystrophy, Lou Gehrig's disease, diabetes, and cancer.

12. The prevalence of Mito, according to the Cleveland Clinic, is about one in five thousand.

13. Due to the incredible complexity of human cellular function and limitations on available testing, only a tiny fraction of these cases can be confirmed with objective testing.

14. Mitochondrial diseases can affect almost any part of the body, including the cells of the brain, nerves, muscles, kidneys, heart, liver, eyes, ears, or pancreas. Symptoms of mitochondrial diseases depend on which cells of the body are affected.

15. Patients' symptoms can range from mild to severe, involve one or more organs, and can occur at any age. Even patients within the same family who have the same mitochondrial disease can have differences in symptoms, severity, and age of onset (start of symptoms).

16. As a result, symptoms of mitochondrial diseases can include:

    a. Poor growth.

    b. Muscle weakness, muscle pain, low muscle tone, exercise intolerance.

    c. Vision and/or hearing problems.

    d. Learning disabilities, delays in development, mental retardation.

    e. Autism, autism-like features.

    f.   Heart, liver, or kidney diseases.

    g.   Gastrointestinal disorders, swallowing difficulties, diarrhea or constipation, unexplained vomiting, cramping, or reflux.

    h.   Diabetes.

    i.   Increased risk of infection.

    j.   Neurological problems, seizures, migraines, or strokes.

    k.   Movement disorders.

    l.   Thyroid problems.

    m.   Respiratory problems.

    n.   Lactic acidosis (a buildup of lactate).

17. Unsurprisingly, in the large percentage of cases where Mito dysfunction cannot be confirmed with objective testing, establishing a uniform standard of care for treatment is impossible – well qualified and highly trained doctors are required to exercise judgment and discretion to develop treatment plans geared towards the specific constellation of symptoms for each particular child.

18. It is well-known that cases involving children who suffer from Mito are particularly medically complex and often a source of diagnostic frustration – it often takes as long as seven years to establish a diagnosis.

19. During that "diagnostic hell," children are often misdiagnosed, provided medical treatment that is unsuccessful, and tragically overmedicalized; all under the care and guidance of trained doctors and through no fault of the child, the parents, or even the doctors.

20. Due to the complex, confusing, and inconsistent presentation of Mito disorders, parents of children with mito are particularly vulnerable to wrongful accusations of child abuse.

21. Likewise, due to the complex, confusing, and inconsistent presentation of mito disorders, diagnostic disputes between providers are common, if not routine.

22. As a result, parents of mito kids are often faced with the nightmare scenario of making a choice between the disparate advice of highly qualified doctors – and, when those scenarios are not handled properly, parents can be subjected to legal battles, custody disputes, allegations of abuse or neglect and, tragically, the refusal of care from medical providers.

23. Prior to approximately 2017-2018, there was no consistent or established standard of care to diagnose mito, although a very small percentage of presumed mito cases could be identified with objective testing.  That diagnosis was left to the discretion and learned judgment of highly trained geneticists.

24. In approximately 2017-2018, however, a new, more objective and consistent diagnostic method was implemented in the medical community to identify and diagnose mito, based on a broader subset of criteria.  But even so, many children and individuals' mito presentations still do not fit within the confines of the new diagnostic method, thereby creating a ripple effect where access to adequate care and coverage for those individuals outside the new diagnostic mold is now even more difficult.  Sadly, G.H. was and is one of those children on the fringe.

25. By way of example and not limitation, this problem of lack of access and adequate care arises when doctors and/or insurers strictly interpret the new diagnostic criteria for

Mito and then refuse to provide treatment and/or coverage for people like G.H. who do not meet said criteria, whereas other doctors continue to exercise their professional judgment in order to formulate clinical diagnoses and treatment plans based on their clinical expertise and the overall health of the child, rather than rigid objective diagnostic criteria. as opposed to strict compliance with published protocols.

26. In other words, these published protocols have established uniform diagnostic criteria for Mito treatment plans, which then get submitted to insurers for payment, however this creates a problematic obstacle to care/treatment for sickly children who do not meet the objective published criteria for diagnosis, like G.H., who then have their treatment regimens changed or eliminated entirely based on decisions of medical providers, and/or the insurers who pay for the treatment services, that prioritize strict compliance with these rigid protocols over the child's actual health and well-being.

27. Prior to the implementation of these rigid diagnostic protocols, G.H.'s clinical team suspected that one substantial cause of his confounding constellation of symptoms was related to mito dysfunction, but since that time, there still is no unifying or confirmed diagnosis that fully explains his condition.

28. G.H.'s medical condition is particularly complex, and he has been provided a variety of treatment plans from a number of highly qualified doctors – G.H. currently has an excellent team of doctors and specialists from Worcester that provide him with high quality and compassionate care.

<u>J.S.H.'s Background</u>

29. J.S.H. is a doctorate level medical ethicist who provides counsel, advocacy, and professional support to parents of medically complex children.

30.  Her first child died tragically of a mito disorder at the age of three, after a seven-month hospitalization at Boston Children's Hospital ("BCH").

31. Due to the complex and frustrating nature of J.S.H.'s first child's mito presentation, an internal ethics review study was opened at BCH to examine the propriety of the parents' decisions for their child and the propriety of the medical care provided to the child.

32. The results of that ethics review concluded that both the parents and the medical team acted appropriately under very difficult and complicated circumstances.

33. When her second child, G.H., began exhibiting concerning health symptoms, the Defendant, Dr. Alice Newton, filed a 51A report against J.S.H. with the Massachusetts Department of Children and Families ("DCF"), accusing her of medical abuse and/or neglect of G.H.

34. The allegations were unsubstantiated, and J.S.H. decided that G.H. should treat with a highly qualified geneticist from Tufts in Boston.

35. Over the next few years, up until 2011, Dr. Newton knowingly and willfully made multiple frivolous complaints, in bad faith, about J.S.H. and her concern that J.S.H. was abusing G.H.  Newton willfully, knowingly, and maliciously complained directly to both Tufts and to DCF through additional frivolous 51A filings, despite the fact that Dr. Newton did not work at Tufts, was not part of G.H.'s treatment team, was not consulted

by G.H.'s treatment team, and did not have any lawful access to his medical chart or medical records.

36. As a result of Newton's willful conduct and frivolous reporting, G.H. was subjected to lengthy diagnostic protocols in which his treatment would be removed in order to determine whether his condition was organic and medical, or as alleged by Dr. Newton, the result of abuse at the hands of J.S.H.

37. These withdrawal treatment regimens would require J.S.H. to have limited contact with G.H. during the withdrawal of treatment, and even the limited contact was under close supervision.

38. These withdrawal processes were painful and frightening for G.H., an ordeal he was required to suffer through without the support or companionship of his parents.

39. In each case, the treatment team concluded that G.H.'s condition was medical, not the product of abuse, and resumed treatment.

40. In each case with DCF, the allegations of abuse made by Newton were unsubstantiated.

41. In each of Dr. Newton's 51A filings related to G.H. prior to 2011, those allegations included material omissions of fact and/or outright false statements.

42. J.S.H., G.H., and Dr. Newton had no contact whatsoever from 2011 until August of 2018.

43. At that time, in August 2018, Dr. Newton was employed by MGH as a child abuse pediatrician.

44. At the time, G.H. was treated by a number of specialists, including a gastroenterologist from Western Massachusetts who practiced medicine as a satellite location of MGH.

J.S.H.'s Involvement in the Justina Pelletier Case
& Defendant Newton's Subsequent Retaliation

45. In late July of 2018, J.S.H. was identified as a witness on behalf of a plaintiff named

    Justina Pelletier, who had a pending lawsuit alleging claims of medical malpractice and

    civil rights violations against Dr. Newton, and others.

46. More specifically, Justina Pelletier and her parents claimed that Dr. Newton wrongfully

    and falsely accused the parents of medical child abuse when, in fact, the parents were

    faced with a mito-related diagnostic dispute between highly qualified treatment teams.

47. More specifically, J.S.H. was identified as a witness who would testify at the Pelletier

    trial, if allowed, that Dr. Newton had a plan, pattern, and practice of making similar

    allegations of abuse and/or neglect that were unfounded and unjustified.

48. Within weeks of that July 2018 witness disclosure, Dr. Newton unlawfully accessed

    G.H.'s medical chart in the MGH system.

49. Thereafter, Dr. Newton proceeded to call G.H.'s medical doctors to share her "concern"

    that G.H. was being abused by his mother [J.S.H.], that he was not really ill, and that the

    doctors were being duped into providing unnecessary medical care to G.H.

50. In each and every instance, G.H.'s medical team rejected Dr. Newton's unfounded and

    frivolous allegations, despite her persistence.

51. Dr. Newton then proceeded, without prompting, to draft a comprehensive letter dated

    September 10, 2018, outlining her abuse allegations against J.S.H.

52. In that letter, Newton falsely claimed that one of G.H.'s doctors requested a child abuse

    consultation.  That same doctor has since testified under oath that this allegation was

    unequivocally false; the doctor never requested a child abuse consultation.

53. Presumably, Dr. Newton made that particular false statement in order to conceal the fact that no doctor-patient relationship existed between her and G.H., and to conceal the fact that she had unlawfully accessed G.H.'s medical chart, in violation of state and federal laws.

54. In that same letter, dated September 10, 2018, Dr. Newton suggested that J.S.H. caused the death of her first child, but did not disclose that the child had been under the care of Boston Children's Hospital for the last seven months of her life, did not disclose that the child's death certificate proves the parents had no role in the child's death, and did not disclose that an internal ethics review concluded that the parents had done nothing that contributed to the first child's tragic death.

55. In that letter, Dr. Newton encouraged the medical team to file a 51A report against J.S.H. with DCF.

56. In that letter, Dr. Newton specifically cited G.H.'s disabilities and medical condition as the basis for her allegations.

57. In that letter, Dr. Newton specifically cited J.S.H.'s association with G.H., and J.S.H.'s association with her deceased child (who was also disabled), as a substantial basis for her allegations.

58. Upon receipt of this letter, yet again, each and every medical provider rejected and disputed Dr. Newton's allegations.  Each one of them, all mandated reporters, refused to file a 51A accusing J.S.H. of abusing G.H.

59. Upon information and belief, Dr. Newton's letter was also forwarded to the Child Abuse Pediatrics team at UMASS Hospital, and that team also rejected Dr. Newton's baseless and willful accusations about J.S.H.

60. Notably, several of those doctors voiced their objections to Newton's frivolous accusations in writing.

61. Apparently dissatisfied with this response, Dr. Newton then took it upon herself to contact DCF and file a 51A against J.S.H., accusing her of causing G.H.'s illness and duping the entire team of medical providers, including the entire UMASS Hospital child pediatrics team, into providing G.H. with unnecessary medical care.

62. In that 51A filing, Dr. Newton again accused J.S.H. of killing her first child.  The report was replete with material omissions and outright false statements of fact.

63. That 51A filing was investigated by DCF, with the investigation led by a newly appointed medical director.  The investigation included home visits with G.H. and J.S.H., interviews with Dr. Newton, interviews with G.H.'s treatment team, and a comprehensive view of the medical record.

64. The report was quickly closed as "unsubstantiated," which under DCF's rules, guidelines, policies, and regulations means that there was not even sufficient evidence to support a reasonable suspicion that abuse or neglect occurred.

65. Since that time, Dr. Newton's letter has become a part of G.H.'s medical record that is viewable to all his medical providers.  As a result, when G.H. and his parents are dealing with providers that are not familiar with the family during his hospitalizations and other

treatments, G.H., J.S.H., and their family are subjected to a heightened level of scrutiny that is unwarranted and sometimes suspicion and hostility.

66. Once J.S.H. became aware of the letter, Justina Pelletier's lawyers sent deposition notices to two of the doctors that claimed they had personal, direct knowledge that Dr. Newton made false statements about, and false allegations against, J.S.H.

67. Upon information and belief, G.H.'s gastroenterologist filed an internal complaint about Newton's false allegations against J.S.H. regarding G.H. prior to the 51A filing.

68. Upon information and belief, G.H.'s primary care doctor also filed an internal complaint with MGH about Dr. Newton's false allegations regarding J.S.H. and G.H. prior to the 51A filing.

69. MGH, by and through agents, employees, and/or servants of the organization who are as of yet unknown, did nothing to protect G.H. and J.S.H. and did nothing to stop Dr. Newton's malicious, willful, and frivolous conduct towards the family.

70. Instead, MGH immediately cloaked the internal complaints and subsequent "investigation" under the secrecy of a peer review privilege proceeding, which was conducted under the supervision of lawyers in MGH's Risk Management Division.

71. Upon information and belief, no action was taken by MGH to discipline or curb Dr. Newton's outrageous conduct against J.S.H. and G.H. prior to the date when she filed the 51A.

72. Upon information and belief, no action was taken by MGH to discipline or curb Dr. Newton's outrageous conduct against J.S.H. and G.H. subsequent to the date when she

filed the 51A, which allowed Dr. Newton, albeit unsuccessfully, to continue her attempts to manipulate the outcome of the DCF investigation.

73. Upon information and belief, the "peer review" process initiated against Dr. Newton by G.H.'s treating doctor(s) did nothing to protect G.H. or to rectify the unlawful and unfounded allegations against him and his mother.

74. Instead, the secret process was used to shield Dr. Newton and the MGH from liability for her willful and malicious conduct and has the consequence, whether intentional or coincidental, of allowing Dr. Newton's frivolous campaign against J.S.H. and G.H. to continue.

75. At the same time Dr. Newton was making false allegations against J.S.H., her counsel in the Pelletier case was attempting to quash subpoenas to depose J.S.H./G.H.'s doctors in that case.

76. Upon information and belief, neither doctor has ever recanted their initial allegations that Dr. Newton made outright false statements in her letter accusing J.S.H. of child abuse.

77. Upon information and belief, Dr. Newton's motivation for the unsubstantiated 2018 allegations of abuse was to retaliate against J.S.H. for her involvement in the Pelletier case, to intimidate J.S.H. so as to prevent her from testifying, and/or to intentionally destroy J.S.H.'s credibility as a witness at the trial of the Pelletier matter.

78. Upon information and belief, Jane and/or John Doe intentionally and knowingly used the peer review process at MGH as a sham proceeding to cloak Dr. Newton's unlawful and outrageous behavior in total secrecy in order to protect the MGH from liability for

her conduct, and in doing so, thereby enabled and encouraged Dr. Newton to continue and escalate her conduct towards J.S.H. and G.H.

79. As a result, J.S.H. and G.H. both suffered and continue to suffer substantial economic, emotional, and physical harms.

**CLAIMS OF PLAINTIFF J.S.H., AS LEGAL GUARDIAN AND ON BEHALF OF MINOR CHILD G.H.**

COUNT I
VIOLATIONS OF 42 U.S.C. § 12182, et. seq. TITLE III OF THE ADA, AS AMENDED BY THE
AMENDMENTS ACT OF 2008 ("ADAA")
(AGAINST ALL DEFENDANTS)

80. Plaintiff repeats and incorporates herein the foregoing paragraphs as if each were set forth here in its entirety.

81. This is a claim of J.S.H. as legal guardian and on behalf of the minor child known as G.H. against the Defendants, Alice Newton, Jane and/or John Doe, and Massachusetts General Hospital.

82. At all times relevant to this Complaint, G.H. was a qualified, disabled individual within the meaning of the ADAA and, as such, was entitled to all the rights and protections afforded under Title III of the ADAA, including but not limited to the right to be free from discrimination on the basis of his disability in the receipt of medical treatment and/or services and in the full and equal enjoyment and participation of other goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation.

83. At all times relevant to this Complaint, Massachusetts General Hospital was, and still is, a place of public accommodation as governed under Title III of the ADAA.

84. For the reasons previously stated herein, Dr. Newton, John and/or Jane Doe, and Massachusetts General Hospital violated G.H.'s rights under Title III of the ADAA and discriminated against him on the basis of his disability, thereby denying him the opportunity to fully and equally receive the benefit of and/or participation in and access to the medical services provided at MGH.

85. By way of example and not limitation, the Defendants discriminated against G.H. by targeting him due to the medical complexity of his disability's presentation and interfering and/or preventing him from receiving equal access to and enjoyment of the medical services, accommodations, and/or privileges usually offered.

86. As a direct and proximate result of the Defendants' violations of G.H.'s rights under the ADAA, G.H. has suffered and continues to suffer significant damages, including but not limited to physical injury, emotional distress, and mental anguish.

WHEREFORE, the Plaintiff G.H. demands judgment against Defendants Dr. Newton, John and/or Jane Doe, and Massachusetts General Hospital for the above-described damages, plus punitive damages, attorney's fees, costs, interest, and further relief to which they are entitled.

COUNT II
VIOLATIONS OF SECTION 504 OF THE REHABILITATION ACT OF 1973
(AGAINST ALL DEFENDANTS)

87. The Plaintiff repeats and realleges the allegations set forth above as if fully contained herein.

88. This is a claim of J.S.H. as legal guardian and on behalf of the minor child known as G.H. against the Defendants, Alice Newton, Jane and/or John Doe, and Massachusetts General Hospital.

89. Plaintiff G.H. is a qualified individual with disabilities within the meaning of Section 504.

90. Defendant Massachusetts General Hospital is a private hospital that receives federal funds and, as such, must comply with the provisions of Section 504 and the regulations promulgated thereunder.

91. The Plaintiff G.H. had clearly established rights under the applicable provisions of Section 504 to participate in and receive the benefits of equal access to the medical services, programs, treatments, patient and/or privacy rights, and/or other opportunities afforded to patients by the Defendants and to be free from discrimination based on his disability in the provision of those programs and/or services at MGH.

92. For the reasons previously stated, and at all times relevant to the Complaint, the Defendants Dr. Newton, John and/or Jane Doe, and Massachusetts General Hospital willfully violated these clearly established rights of G.H.

93. By way of example and not limitation, the Defendants targeted and discriminated against G.H. on the basis of his qualified disability, thereby limiting and/or denying his ability to equally access, receive, participate, and/or enjoy the benefits, rights, and/or services provided at MGH.

94. As a direct and proximate result of the Defendants' violations of Section 504, the Plaintiff G.H. suffered and continues to suffer significant damages, including but not limited to emotional distress, physical harm, mental anguish, and worsened disability symptoms.

WHEREFORE, the Plaintiff G.H. demands judgment against the Defendants, Dr. Newton, John and/or Jane Doe, and Massachusetts General Hospital for the above-described damages, plus punitive damages, attorney's fees, costs, interest, and further relief to which he is entitled.

<u>COUNT III</u>
<u>VIOLATION OF 42 U.S.C. § 1985 (2) - CONSPIRACY</u>
(AGAINST ALL DEFENDANTS)

95. Plaintiffs repeats and incorporates herein the foregoing paragraphs as if each were set forth here in its entirety.

96. As discussed more fully above, Defendants Dr. Newton and John and/or Jane Doe conspired, directly or indirectly, for the purpose of cloaking Defendant Dr. Newton's conduct and preventing J.S.H. and G.H.'s doctors from testifying about the above events due to the peer review privilege.

97. To the extent that Defendant Dr. Newton was acting outside the scope of her employment when she unlawfully accessed G.H.'s medical chart in the MGH system, Defendant Massachusetts General Hospital also participated in the above-described conspiracy by doing nothing to halt Defendant Dr. Newton's conduct towards the family, and cloaking the complaints and subsequent "investigation" under the secrecy of a peer review privilege proceeding – which was conducted under the supervision of lawyers in the hospital's Risk Management division.

98. Accordingly, the Defendants conspired for the purpose of impeding, hindering, obstructing, or defeating the due course of justice in the Massachusetts Superior Court with the intent to deny G.H., as a person with a disability, the equal protection of the laws.

99. The misconduct described in in this count was undertaken with malice, willfulness, and reckless indifference to the rights of others.

WHEREFORE, the Plaintiff G.H. demands judgment against Defendants Dr. Newton, John and/or Jane Doe, and Massachusetts General Hospital for the above-described damages, plus punitive damages, attorney's fees, costs, interest, and further relief to which they are entitled.

COUNT IV
INTENTIONAL INFLICTION OF EXTREME EMOTIONAL DISTRESS
(AGAINST DEFENDANT ALICE NEWTON)

100.    Plaintiff repeats and incorporates herein the foregoing paragraphs as if each were set forth here in its entirety.

101.    This is a claim of J.S.H. as legal guardian and on behalf of the minor child known as G.H. against the Defendant, Alice Newton.

102.    Defendant Alice Newton did intentionally and/or recklessly subject the Plaintiff G.H. to conduct that was extreme, outrageous, shocking to the conscience, and utterly intolerable in civilized society that no reasonable person should be or could be expected to endure.

103.    As a direct and proximate result of Dr. Newton's extreme and outrageous intentional conduct, G.H. has suffered and continues to suffer significant damages, including but not limited to severe and enduring emotional distress manifesting in physical injury, such as physical distress and worsening disability symptoms, among others.

104.    Dr. Newton's outrageous conduct resulted in emotional distress to G.H.  Her actions were fraudulent, malicious, and oppressive.  G.H. is thus entitled to and herein

seeks punitive and exemplary damages from Dr. Newton, in an amount according to proof at trial, to punish Dr. Newton and deter others from engaging in similar future conduct.

WHEREFORE, the Plaintiff G.H. demands judgment against Defendant Dr. Newton for the above-described damages, plus punitive damages, attorney's fees, costs, interest, and further relief to which they are entitled.

<u>COUNT V</u>
<u>NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS</u>
<u>AGAINST DEFENDANT DR. ALICE NEWTON</u>

105.    Plaintiff repeats and incorporates herein the foregoing paragraphs as if each were set forth here in its entirety.

106.    This is a claim of J.S.H. as legal guardian and on behalf of the minor child known as G.H. against the Defendant, Alice Newton.

107.    Defendant Newton did intentionally engage in conduct towards the Plaintiff that was extreme and outrageous and that Defendant knew, or should have known, was such conduct likely to cause the Plaintiff severe emotional distress and personal injury if continued.

108.    As a direct, proximate and foreseeable result of Defendant Dr. Newton's extreme and outrageous conduct against G.H., G.H. has suffered and continues to suffer general damages including but not limited to significant and enduring emotional distress including humiliation, mental anguish and physical distress, injury to mind and body, in a sum to be proven at trial, in excess of the minimum jurisdictional requirements of this Court.

WHEREFORE, the Plaintiff G.H. demands judgment against Defendant Dr. Newton for the above-described damages, plus punitive damages, attorney's fees, costs, interest, and further relief to which they are entitled.

**CLAIMS OF THE PLAINTIFF J.S.H., IN HER INDIVIDUAL CAPACITY**

COUNT VI
VIOLATIONS OF 42 U.S.C. § 12182(b)(E) TITLE III OF THE ADA, AS AMENDED BY THE
AMENDMENTS ACT OF 2008 ("ADAA")
(AGAINST ALL DEFENDANTS)

109.     Plaintiff repeats and incorporates herein the foregoing paragraphs as if each were set forth here in its entirety.

110.     This is a claim of J.S.H. in her individual capacity against the Defendants, Alice Newton, Jane and/or John Doe, and Massachusetts General Hospital.

111.     At all times relevant to this Complaint, G.H. was an individual with a known qualified disability within the meaning of the ADAA, and J.S.H. was an individual known by the Defendants to be associated and in a familial relationship with G.H. and, as such, J.S.H. was entitled to all the rights and protections afforded under Title III of the ADAA, including but not limited to the right to be free from discrimination on the basis of that association by way of exclusion and/or denial from equal access to the goods, services, and/or opportunities provided by the Defendants at their place of public accommodation.

112.     At all times relevant to this Complaint, Massachusetts General Hospital was, and still is, a place of public accommodation as governed under Title III of the ADAA.

113.     For the reasons previously stated herein, Dr. Newton, John and/or Jane Doe, and

Massachusetts General Hospital violated J.S.H.'s rights under Title III of the ADAA and

discriminated against J.S.H. based on her association and relationship with her disabled

son, G.H.

114.     As a direct and proximate result of the Defendants' violations of J.S.H.'s rights

under the ADAA to be free from discrimination due to association and/or relationship

with a disabled individual, J.S.H. has suffered and continues to suffer significant

damages, including but not limited to emotional distress, economic loss, psychological

harm, and mental anguish.

WHEREFORE, the Plaintiff J.S.H. demands judgment against Defendants Dr. Newton,

John and/or Jane Doe, and Massachusetts General Hospital for the above-described damages,

plus punitive damages, attorney's fees, costs, interest, and further relief to which they are

entitled.

COUNT VII
VIOLATION OF 42 U.S.C. § 1985 (2) - CONSPIRACY TO INTIMIDATE A WITNESS
(AGAINST ALL DEFENDANTS)

115.     Plaintiff repeats and incorporates herein the foregoing paragraphs as if each

were set forth here in its entirety.

116.     This is a claim of J.S.H. in her individual capacity against the Defendants, Alice

Newton, Jane and/or John Doe, and Massachusetts General Hospital.

117.     For the reasons stated previously, Defendants Dr. Newton and John and/or Jane

Doe conspired, directly or indirectly, for the purpose of cloaking Defendant Dr. Newton's

conduct and preventing J.S.H. and G.H.'s doctors from testifying about the events

described herein due to the peer review privilege in an effort to shield themselves
and/or MGH from liability for the violations of the Plaintiffs rights.

118.    To the extent that Defendant Dr. Newton was acting outside the scope of her
employment when she unlawfully accessed G.H.'s medical chart in the MGH system,
Defendant Massachusetts General Hospital also participated in the above-described
conspiracy by doing nothing to halt Defendant Dr. Newton's conduct towards the family,
and cloaking the complaints and subsequent "investigation" under the secrecy of a peer
review privilege proceeding – which was conducted under the supervision of lawyers in
the hospital's Risk Management Division.

119.    Accordingly, the Defendants conspired for the purpose of impeding, hindering,
obstructing, or defeating the due course of justice in the Massachusetts Superior Court
with the intent to deny J.S.H. and G.H., as a person with a disability, the equal
protection of the laws.

120.    The misconduct described in in this count was undertaken with malice,
willfulness, and reckless indifference to the rights of others.

WHEREFORE, the Plaintiff J.S.H. demands judgment against Defendants Dr. Newton,
John and/or Jane Doe, and Massachusetts General Hospital for the above-described damages,
plus punitive damages, attorney's fees, costs, interest, and further relief to which they are
entitled.

<u>COUNT VIII</u>
<u>INTENTIONAL INFLICTION OF EXTREME EMOTIONAL DISTRESS</u>
(AGAINST DEFENDANT ALICE NEWTON)

121.     Plaintiff repeats and incorporates herein the foregoing paragraphs as if each

were set forth here in its entirety.

122.     This is a claim of J.S.H. in her individual capacity against the Defendant, Alice

Newton.

123.     As previously described herein, Defendant Alice Newton did intentionally and/or

recklessly subject the Plaintiff to conduct that was extreme, outrageous, shocking to the

conscience, and utterly intolerable in civilized society that no reasonable person should

be or could be expected to endure.

124.     As a direct and proximate result of Dr. Newton's extreme and outrageous

intentional conduct, J.S.H. has suffered and continues to suffer significant damages,

including but not limited to severe and enduring emotional distress manifesting in

physical injury, anxiety, among other symptoms.

125.     Dr. Newton's outrageous conduct resulted in emotional distress to J.S.H.  Her

actions were fraudulent, malicious, and oppressive.  J.S.H. is thus entitled to and herein

seeks punitive and exemplary damages from Dr. Newton, in an amount according to

proof at trial, to punish Dr. Newton and deter others from engaging in similar future

conduct.

WHEREFORE, the Plaintiff J.S.H. demands judgment against Defendant Dr. Newton for

the above-described damages, plus punitive damages, attorney's fees, costs, interest, and

further relief to which they are entitled.

<u>COUNT IX</u>
<u>NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS</u>
<u>AGAINST DEFENDANT DR. ALICE NEWTON</u>

126.     Plaintiff repeats and incorporates herein the foregoing paragraphs as if each

were set forth here in its entirety.

127.     This is a claim of J.S.H. in her individual capacity against the Defendant, Alice

Newton.

128.     Defendant Newton did intentionally engage in conduct towards the Plaintiff that

was extreme and outrageous and that Defendant knew, or should have known, was

such conduct likely to cause the Plaintiff severe emotional distress and personal injury if

continued.

129.     As a direct, proximate and foreseeable result of Defendant Dr. Newton's extreme

and outrageous conduct against J.S.H., she has suffered and continues to suffer general

damages including but not limited to significant and enduring emotional distress

including humiliation, mental anguish and physical distress, injury to mind and body, in a

sum to be proven at trial, in excess of the minimum jurisdictional requirements of this

Court.

WHEREFORE, the Plaintiff J.S.H. demands judgment against Defendant Dr. Newton for

the above-described damages, plus punitive damages, attorney's fees, costs, interest, and

further relief to which they are entitled.

<u>PRAYER FOR RELIEF</u>

The Plaintiffs respectfully request that this Honorable Court enter judgment in their favors on all claims and:

a. Award Plaintiffs compensatory, special, and punitive damages;

b. Award Plaintiffs their attorney's fees; and

c. Enter any other equitable relief that this Court deems fair and just.

**The Plaintiffs demand a jury trial on all claims so triable.**

Respectfully Submitted,
The Plaintiffs,
By their attorneys,

**/s/ John T. Martin**
John T. Martin; BBO # 676344
jmartin@kjclawfirm.com
Michaela M. Weaver; BBO # 705985
mweaver@kjclawfirm.com
KJC Law Firm, LLC
One Exchange Place, 2nd Level
Worcester, MA 01609
(617) 720-8447

Dated: <u>August 10, 2021</u>