UNITED STATES OF AMERICA
DISTRICT COURT OF MASSACHUSETTS

_____

| | |
|---|---|
| J.S.H., in her Individual Capacity, and as the Legal Guardian and on Behalf of a Minor Child, known as G.H., *Plaintiffs,* v. Alice Newton, M.D., Jane and/or John Doe, and Massachusetts General Hospital, Defendants | ) ) ) ) ) ) ) ) ) ) ) ) |

Civil Action No. 4:21-cv-40086

**PLAINTIFFS' FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**
**(INJUNCTIVE RELIEF REQUESTED)**

THE PARTIES

1. The Plaintiff, G.H., is a male minor child, currently twelve (12) years old, who resides in the Town of Clinton, located in Worcester County, Massachusetts.

2. The Plaintiff, J.S.H., is G.H.'s biological mother and his legal guardian.

3. The Defendant, Alice Newton, is a medical doctor who maintains a principal place of business at Massachusetts General Hospital ("MGH"), located at 55 Fruit Street in Boston, Massachusetts.

4. The Defendant(s), Jane and/or John Doe, are one or more employees of MGH whose identity is, as of yet, unknown to the Plaintiffs.

5. The Defendant, Massachusetts General Hospital, is a nonprofit, charitable organization that maintains a principal place of business at 55 Fruit Street in Boston, Massachusetts, as well as satellite MGH offices across the state.

<u>JURISDICTION AND VENUE</u>

6.  Jurisdiction is proper in this Court pursuant to 28 U.S.C. §§ 1331 and 1334, as the Plaintiffs assert claims under Title III of the Americans with Disabilities Act, as amended, 42 U.S.C. § 12181, <u>et seq</u>. ("ADAA"), Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 ("Section 504"), and 42 U.S.C. § 1985.

7.  Venue is proper in this judicial district because a substantial portion of the nexus of facts giving rise to this cause of action occurred in Worcester County.

<u>FACTS</u>

**G.H.'s Background**

8.  G.H. is a 12-year-old child who suffers from serious and potentially fatal medical illnesses, which render him completely disabled.  He requires mechanical assistance to oxygenate and take nourishment, he has poor muscle tone, and he suffers from a complex constellation of multi-systemic symptoms, which have continued to persist throughout the bulk of his young life and require extensive and ongoing medical treatment and specialized services under the supervision and at the direction of highly skilled doctors on his treatment team.

9.   At one point in time, G.H.'s clinical team suspected that one substantial cause of his confounding constellation of symptoms was "Mitochondrial Dysfunction."[1]

---

[1] Mitochondrial Disease, Mitochondrial Disorder, and Mitochondrial Dysfunction are all commonly referred to as "Mito" in the medical community, and the terms can be used nearly interchangeably, although there are subtle, but important, distinctions.  For the purposes of this Complaint, the term "Mito" can be understood to mean mitochondrial dysfunction, generally.

10. Mito conditions are long-term, often genetic disorders, that adversely affect the body's mitochondria, which are known as the "powerhouse" of the body's cells because their enzymes oxidize food and convert the nutrients into energy for the cell.

11. It is well-known that cases involving children who suffer from Mito are particularly medically complex and often a source of diagnostic frustration due to significant limitation in the ability to confirm diagnosis with objective testing and the inconsistency of its presentation; mitochondrial diseases can affect almost any part of the body (brain, nerves, muscles, kidneys, heart, liver, eyes, ears, pancreas, etc;), the age of onset in patients varies, and the severity of symptoms can range from mild to severe.[2]

12. Prior to approximately 2017-2018, there was no consistent or established standard of care to diagnose Mito and that diagnosis was left to the discretion and learned judgment of highly trained geneticists.

13. Unsurprisingly, in the large percentage of cases where Mito dysfunction cannot be confirmed with objective testing, establishing a uniform standard of care for treatment is nearly impossible – well qualified and highly trained doctors are required to exercise judgment and discretion to develop treatment plans geared towards the specific constellation of symptoms for each particular child.

---

[2] By way of example and not limitation, Mito symptoms can include: poor growth, muscle weakness/pain, vision or hearing problems, learning disabilities and developmental delays, Autism/autism-like features, heart, liver, or kidney diseases, gastrointestinal disorders, swallowing difficulties, diarrhea or constipation, unexplained vomiting, cramping, or reflux, Diabetes, increased risk of infection, neurological problems, seizures, migraines, or strokes, thyroid or respiratory problems, and/or lactic acidosis.

14. During that "diagnostic hell," children are still often misdiagnosed, provided medical treatment that is unsuccessful, and tragically overmedicalized; all under the care and guidance of highly trained doctors and through no fault of the child, the parents, or even the treating doctors.

15. Due to the complex, confusing, and inconsistent presentation of Mito disorders or presumed Mito dysfunction, children and parents are often targeted and particularly vulnerable to wrongful accusations of child abuse and neglect, as well as the inability to access medical care and services, and similarly, diagnostic disputes between providers are common, if not routine.

16. As a result, parents of Mito kids are often faced with the nightmare scenario of making a choice between the disparate advice of highly qualified doctors – and, when those scenarios are not handled properly, parents can be subjected to legal battles, custody disputes, allegations of abuse or neglect and, tragically, the refusal of care from medical providers.

17. In approximately 2017-2018, however, a new, more objective and consistent diagnostic method was implemented in the medical community to identify and diagnose Mito, based on a broader subset of criteria.  But even so, many children and individuals' Mito presentations still do not fit within the confines of the new diagnostic method.

18. Prior to the implementation of these rigid diagnostic protocols, G.H.'s clinical team suspected that one substantial cause of his confounding constellation of symptoms

was related to Mito dysfunction, but since that time, there still is no unifying or confirmed diagnosis that fully explains his condition.

19. G.H.'s medical condition is particularly complex, and he has been provided a variety of treatment plans from a number of highly qualified doctors – G.H. currently has an excellent team of doctors and specialists from Worcester that provide him with high quality and compassionate care.

### J.S.H.'s Background

20. J.S.H. is a doctorate level medical ethicist who provides counsel, advocacy, and professional support to parents of medically complex children.

21. In approximately July of 2011, J.S.H.'s first child died tragically of a Mito disorder at the age of four, after a seven-month hospitalization at Boston Children's Hospital ("BCH"). The child was still admitted at BCH when she died and was under the care and supervision of BCH medical providers for her condition.

22. Due to the complex and frustrating nature of J.S.H.'s first child's Mito presentation, an internal ethics review study was opened at BCH to examine the propriety of the parents' decisions for their child and the propriety of the medical care provided to the child at BCH.

23. The results of that ethics review concluded that both the parents and the medical team acted appropriately in the care and treatment of the child and did so under very difficult and complicated circumstances, all of which was documented in the child's medical records, which specifically referenced the child's Mito condition.

24. Thereafter, G.H. – who was three years-old at this time - began exhibiting concerning and complex health symptoms and received treatment and medical services at BCH.

25. At this point in time, in 2011, the Defendant, Dr. Alice Newton ("Newton") was the head of the Child Protection Team at BCH and was very familiar with both J.S.H. and G.H.

26. In approximately November of 2011, Newton filed a 51A report against J.S.H. with the Massachusetts Department of Children and Families ("DCF"), accusing her of medical abuse and/or neglect of G.H.  Upon information and belief, Newton's 51A report contained frivolous allegations that JSH was faking GH's disability when he did not actually have one since her first child died; and Newton knowingly made false allegations in the report that JSH was subjecting GH to unnecessarily painful avenues of treatments not medically indicated when the medical records clearly indicated otherwise – as DCF actually pointed out when it found Newton's allegations of abuse unsubstantiated.

27. J.S.H. decided that G.H. should treat with a highly qualified geneticist from Tufts in Boston to address his worsening medical conditions moving forward, as she was of the belief that GH's disability may be Mito, given the similarities in presentation to that of her first child with the diagnosis. However, she indicated to DCF that she and GH will still return to BCH for medical services he may need that can only be met in a hospital of BCH's well-recognized caliber.

28. Upon information and belief, even after JSH and GH left BCH, Newton willfully, knowingly, and maliciously complained directly to both Tufts and to DCF through

additional frivolous 51A filings, in bad faith, despite the fact that Dr. Newton did not

work at Tufts, was not part of G.H.'s treatment team, was not consulted by G.H.'s

treatment team, did not have any lawful access to his medical chart or medical

records, and was not acting in any official capacity as a mandator reporter

29. Upon information and belief, as a result of Newton's willful conduct and frivolous

reporting, G.H. was subjected to lengthy diagnostic protocols in which his treatment

would be removed in order to determine whether his condition was organic and

medical, or as alleged by Newton, the result of abuse at the hands of J.S.H.

30. These withdrawal treatment regimens would require J.S.H. to have only limited, and

supervised, contact with G.H. during the withdrawal of treatment, and withdrawal

processes were painful and frightening for G.H., an ordeal he was required to suffer

through without the support or companionship of his parents.

31. In each case, the treatment team concluded that G.H.'s condition was medical, not

the product of abuse, and resumed treatment.  In each case with DCF, the allegations

of abuse made by Newton were unsubstantiated.  And in each of Dr. Newton's 51A

filings related to G.H. prior to 2011, those allegations included material omissions of

fact and/or outright false statements.

32. From 2011 until August 2018, J.S.H. and G.H. had no contact with Newton and vice

versa.

### 2018 Events Following the Identification of
### J.S.H. as a Witness Against Newton in the Justina Pelletier Lawsuit

33. Prior to August of 2018, Newton had left her position with BCH.

34. In August of 2018, Dr. Newton operated the Child Protection Program at Massachusetts General Hospital ("MGH") in her role as Medical Director.

35. At the time, G.H. was treated by a number of specialists, including a gastroenterologist from Western Massachusetts who practiced medicine at a satellite location of MGH.

36. In late July of 2018, J.S.H. was identified as a witness on behalf of a plaintiff named Justina Pelletier who had a pending lawsuit out of the Massachusetts Suffolk Superior Court alleging claims of medical malpractice and civil rights violations against Dr. Newton (and others).  Justina Pelletier and her parents claimed that Dr. Newton wrongfully and falsely accused the parents of medical child abuse when, in fact, the parents were faced with a Mito-related diagnostic dispute between highly qualified treatment teams.

37. J.S.H. was identified as a witness who would testify at the Pelletier trial, if allowed, that Dr. Newton had a plan, pattern, and practice of making similar allegations of abuse and/or neglect that were unfounded and unjustified.

38. Within about two weeks of that July 2018 witness disclosure identifying J.S.H., Dr. Newton unlawfully accessed G.H.'s medical chart in the MGH system without the consent or authorization of G.H., J.S.H., or G.H.'s treating provider at MGH at time, whom was the gastroenterologist (GI) specialist operating out of the MGH satellite facility in Western Massachusetts.

39. Thereafter, Dr. Newton proceeded to badger G.H.'s current medical doctors via text messages, emails, and phone calls over the following month to see if they would

request a consultation with her and the MGH Child Protection Team on the basis of her "concern" that JSH was medically abusing GH.

40. Since Newton had absolutely no doctor-patient relationship with GH in 2018, considering she hadn't set eyes on him since 2011, she could not initiate one herself and needed one of the other doctors to request a consult in order for her scheme to work against JSH – and to cover up the fact that she illegally accessed his records to begin with.

41. However, in each and every instance, G.H.'s medical team rejected Dr. Newton's unfounded and frivolous allegations, despite her persistence.

42. Dr. Newton then proceeded, without prompting, to draft a comprehensive letter dated September 7, 2018, outlining her utterly false and misleading abuse allegations against J.S.H.

43. In that letter, Newton falsely claimed that one of G.H.'s doctors requested a child abuse consultation.  That same doctor has since testified under oath that this allegation was unequivocally false; the doctor never requested a child abuse consultation.

44. Presumably, Dr. Newton made that particular false statement in order to conceal the fact that no doctor-patient relationship existed between her and G.H., and to conceal the fact that she had unlawfully accessed G.H.'s medical chart, in violation of state and federal laws.

45. In that same letter, dated September 7, 2018, Dr. Newton suggested that J.S.H. caused the death of her first child, but did not disclose that the child had been under

the care of Boston Children's Hospital for the last seven months of her life, did not disclose that the child's death certificate proves the parents had no role in the child's death, and did not disclose that an internal ethics review concluded that the parents had done nothing that contributed to the first child's tragic death.

46. In that letter, Dr. Newton encouraged the medical team to file a 51A report against J.S.H. with DCF and specifically cited G.H.'s disabilities and medical condition as the basis for her allegations, as well as J.S.H.'s association with G.H., and J.S.H.'s association with her deceased child (who was also disabled), as a substantial basis for her allegations.

47. Upon receipt of this letter, yet again, each and every medical provider rejected and disputed Dr. Newton's allegations.  Each one of them, all mandated reporters, refused to file a 51A accusing J.S.H. of abusing G.H.

48. Upon information and belief, Dr. Newton's letter was also forwarded to the Child Abuse Pediatrics team at UMASS Hospital, and that team also rejected Dr. Newton's baseless and willful accusations about J.S.H.

49. Notably, several of those doctors voiced their objections to Newton's frivolous accusations in writing.

50. Apparently dissatisfied with this response, Dr. Newton then took it upon herself to contact DCF and file a 51A against J.S.H., accusing her of causing G.H.'s illness and duping the entire team of medical providers, including the entire UMASS Hospital and child pediatrics team, into providing G.H. with unnecessary medical care.

51. In that 51A filing, Dr. Newton again accused J.S.H. of killing her first child.  The report was replete with material omissions and outright false statements of fact.

52. That 51A filing was investigated by DCF, with the investigation led by a newly appointed medical director.  The investigation included home visits with G.H. and J.S.H., interviews with Dr. Newton, interviews with G.H.'s treatment team, and a comprehensive view of the medical record.

53. The report was quickly closed as "unsubstantiated," which under DCF's rules, guidelines, policies, and regulations means that there was not sufficient evidence to support a reasonable suspicion that abuse, or neglect occurred.

54. Since that time, Dr. Newton's letter has become a part of G.H.'s medical record that is viewable to all his medical providers.  Newton actually attempted to get the letter removed from GH's medical record at UMass via an administrative procedure, but UMass denied her since that facility did not actually create the record – she did.

55. When JSH requested GH's full medical records from MGH, Newton's letter was not included in the chart.  Massachusetts laws requires that the letter, which includes a health summary and diagnostic opinion, should have been in the chart if, in fact, a doctor-patient relationship existed between Newton and G.H.

56. However, the letter has been permanently placed in G.H.'s medical chart at UMASS and efforts to sanitize his chart of the record have been futile because, according to UMASS's legal department, the letter was "generated by a medical provider from an outside facility."  As a result of the defamatory and false letter remaining in GH's records, when G.H. and his parents are dealing with providers that are not familiar

with the family during his hospitalizations and other treatments, G.H., J.S.H., and

their family are subjected to a heightened level of scrutiny, delays in services, and

sometimes hostility.

57. Once J.S.H. became aware of the letter, Justina Pelletier's lawyers sent deposition

notices to two of the doctors that claimed they had personal, direct knowledge that

Dr. Newton made false statements about, and false allegations against, J.S.H.

58. Upon information and belief, G.H.'s gastroenterologist filed an internal complaint

about Newton's false allegations against J.S.H. regarding G.H. prior to the 51A filing.

59. Upon information and belief, G.H.'s primary care doctor also filed an internal

complaint with MGH about Dr. Newton's false allegations regarding J.S.H. and G.H.

prior to the 51A filing.

60. MGH, by and through agents, employees, and/or servants of the organization who

are as of yet unknown, did nothing to protect G.H. and J.S.H. and did nothing to stop

Dr. Newton's malicious, willful, and frivolous conduct towards the family.

61. Instead, MGH immediately cloaked the internal complaints and subsequent

"investigation" under the secrecy of a peer review privilege proceeding, which was

conducted under the supervision of lawyers in MGH's Risk Management Division.

62. Upon information and belief, no action was taken by MGH to discipline or curb Dr.

Newton's outrageous conduct against J.S.H. and G.H. prior to the date when she filed

the 51A.

63. Upon information and belief, no action was taken by MGH to discipline or curb Dr.

Newton's outrageous conduct against J.S.H. and G.H. subsequent to the date when

she filed the 51A, which allowed Dr. Newton, albeit unsuccessfully, to continue her attempts to manipulate the outcome of the DCF investigation.

64. Upon information and belief, the "peer review" process initiated against Dr. Newton by G.H.'s treating doctor(s) did nothing to protect G.H. or to rectify the unlawful and unfounded allegations against him and his mother.

65. Instead, the secret process was used to shield Dr. Newton and the MGH from liability for her willful and malicious conduct and has the consequence, whether intentional or coincidental, of allowing Dr. Newton's frivolous campaign against J.S.H. and G.H. to continue; instead, the process was used to intimidate and silence the whistleblower who exposed Dr. Newton's misconduct.

66. At the same time Dr. Newton was making false allegations against J.S.H., her counsel in the Pelletier case was attempting to quash subpoenas to depose J.S.H./G.H.'s doctors in that case.

67. Although both doctors provided testimony under oath in the Pelletier case, the depositions are currently under seal of a confidentiality order issued during the discovery phase of that case.  Upon information and belief, neither doctor has ever recanted or contradicted their allegations that Dr. Newton made outright false statements in her letter accusing J.S.H. of child abuse.

68. Upon information and belief, Dr. Newton's motivation for the unsubstantiated 2018 allegations of abuse was to target, harass, and discriminate against J.S.H. and G.H. once again based of the nature of his disability and her association, as well as retaliate against J.S.H. for her involvement in the Pelletier case, to intimidate J.S.H. to

prevent her from testifying, and/or to intentionally destroy J.S.H.'s credibility as a witness at the trial of the Pelletier matter.

69. Upon information and belief, Jane and/or John Doe intentionally and knowingly used the peer review process at MGH as a sham proceeding to cloak Dr. Newton's unlawful and outrageous behavior in total secrecy in order to protect the MGH from liability for her conduct, and in doing so, thereby enabled and encouraged Dr. Newton to continue and escalate her conduct towards J.S.H. and G.H.

70. As a result, J.S.H. and G.H. both suffered and continue to suffer substantial economic, emotional, and physical harms.

**CLAIMS OF PLAINTIFF J.S.H., AS LEGAL GUARDIAN AND ON BEHALF OF MINOR CHILD G.H.**

COUNT I
VIOLATIONS OF 42 U.S.C. § 12182, et. seq. TITLE III OF THE ADA, AS AMENDED BY THE AMENDMENTS ACT OF 2008 ("ADAA")
(AGAINST ALL DEFENDANTS)

71. Plaintiff repeats and incorporates herein the foregoing paragraphs as if each were set forth here in its entirety.

72. This is a claim of J.S.H. as legal guardian and on behalf of the minor child known as G.H. against the Defendants, Alice Newton, Jane and/or John Doe, and Massachusetts General Hospital.

73. At all times relevant to this Complaint, G.H. was a qualified, disabled individual within the meaning of the ADAA and, as such, was entitled to all the rights and protections afforded under Title III of the ADAA, including but not limited to the right to be free from discrimination on the basis of his disability in places of public accommodation such as MGH and to receive the full and equal enjoyment and participation of other

14

goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation.

74. At all times relevant to this Complaint, Massachusetts General Hospital was, and still is, a place of public accommodation as governed under Title III of the ADAA.

75. For the reasons previously stated herein, Dr. Newton, John and/or Jane Doe, and Massachusetts General Hospital violated G.H.'s rights under Title III of the ADAA and discriminated against him on the basis of his disability, thereby denying him the opportunity to fully and equally receive the benefit of and/or participation in and access to the medical services provided at MGH.

76. By way of example and not limitation, the Defendants discriminated against G.H. by targeting him based on the nature of his disability, which in effect prevented and/or deterred him from receiving access to the goods, services, accommodations, and privileges usually offered.

77. As a direct and proximate result of the Defendants' violations of G.H.'s rights under the ADAA, G.H. has suffered and continues to suffer significant damages, including but not limited to physical injury, emotional distress, and mental anguish.

WHEREFORE, the Plaintiff G.H. demands judgment against Defendants Dr. Newton, John and/or Jane Doe, and Massachusetts General Hospital for injunctive relief, attorney's fees and litigation costs, and further relief to which they are entitled.

COUNT II
VIOLATIONS OF SECTION 504 OF THE REHABILITATION ACT OF 1973
(AGAINST ALL DEFENDANTS)

78. The Plaintiff repeats and realleges the allegations set forth above as if fully contained herein.

79. This is a claim of J.S.H. as legal guardian and on behalf of the minor child known as G.H. against the Defendants, Alice Newton, Jane and/or John Doe, and Massachusetts General Hospital.

80. Plaintiff G.H. is a qualified individual with disabilities within the meaning of Section 504.

81. Defendant Massachusetts General Hospital is a private hospital that receives federal funds and, as such, must comply with the provisions of Section 504 and the regulations promulgated thereunder.

82. The Plaintiff G.H. had clearly established rights under the applicable provisions of Section 504 to participate in and receive the benefits of equal access to the medical services, programs, treatments, patient and/or privacy rights, and/or other opportunities afforded to patients by the Defendants and to be free from discrimination based on his disability in the provision of those programs and/or services at MGH.

83. For the reasons previously stated, and at all times relevant to the Complaint, the Defendants Dr. Newton, John and/or Jane Doe, and Massachusetts General Hospital willfully violated these clearly established rights of G.H.

84. By way of example and not limitation, the Defendants targeted and discriminated against G.H. on the basis of his qualified disability, thereby limiting and/or denying his ability to equally access, receive, participate, and/or enjoy the benefits, rights, and/or services provided at MGH.

85. As a direct and proximate result of the Defendants' violations of Section 504, the Plaintiff G.H. suffered and continues to suffer significant damages, including but not limited to emotional distress, physical harm, mental anguish, and worsened disability symptoms.

WHEREFORE, the Plaintiff G.H. demands judgment against the Defendants, Dr. Newton, John and/or Jane Doe, and Massachusetts General Hospital for the above-described damages, plus punitive damages, attorney's fees, costs, interest, and further relief to which he is entitled.

COUNT III
VIOLATION OF 42 U.S.C. § 1985 (2) - CONSPIRACY
(AGAINST ALL DEFENDANTS)

86. Plaintiffs repeats and incorporates herein the foregoing paragraphs as if each were set forth here in its entirety.

87. As discussed more fully above, Defendants Dr. Newton and John and/or Jane Doe conspired, directly or indirectly, for the purpose of cloaking Defendant Dr. Newton's conduct and preventing J.S.H. and G.H.'s doctors from testifying about the above events due to the peer review privilege in an effort to shield themselves and/or MGH from liability for the violations of the Plaintiffs rights and they did so with invidiously discriminatory animus based on G.H.'s membership in a protected based on disability.

17

88. To the extent that Defendant Dr. Newton was acting outside the scope of her employment when she unlawfully accessed G.H.'s medical chart in the MGH system, Defendant Massachusetts General Hospital also participated in the above-described conspiracy by doing nothing to halt Defendant Dr. Newton's conduct towards the family, and cloaking the complaints and subsequent "investigation" under the secrecy of a peer review privilege proceeding – which was conducted under the supervision of lawyers in the hospital's Risk Management division.

89. Accordingly, the Defendants conspired for the purpose of impeding, hindering, obstructing, or defeating the due course of justice in the Massachusetts Superior Court with the intent to deny G.H., as a person with a disability, the equal protection of the laws.

90. The misconduct described in in this count was undertaken with malice, willfulness, and reckless indifference to the rights of others.

WHEREFORE, the Plaintiff G.H. demands judgment against Defendants Dr. Newton, John and/or Jane Doe, and Massachusetts General Hospital for the above-described damages, plus punitive damages, attorney's fees, costs, interest, and further relief to which they are entitled.

COUNT IV
INTENTIONAL INFLICTION OF EXTREME EMOTIONAL DISTRESS
(AGAINST DEFENDANT ALICE NEWTON)

91. Plaintiff repeats and incorporates herein the foregoing paragraphs as if each were set forth here in its entirety.

92. This is a claim of J.S.H. as legal guardian and on behalf of the minor child known as G.H. against the Defendant, Alice Newton.

93. Defendant Alice Newton did intentionally and/or recklessly subject the Plaintiff G.H. to conduct that was extreme, outrageous, shocking to the conscience, and utterly intolerable in civilized society that no reasonable person should be or could be expected to endure.

94. As a direct and proximate result of Dr. Newton's extreme and outrageous intentional conduct, G.H. has suffered and continues to suffer significant damages, including but not limited to severe and enduring emotional distress manifesting in physical injury, such as physical distress and worsening disability symptoms, among others.

95. Dr. Newton's outrageous conduct resulted in emotional distress to G.H.  Her actions were fraudulent, malicious, and oppressive.  G.H. is thus entitled to and herein seeks punitive and exemplary damages from Dr. Newton, in an amount according to proof at trial, to punish Dr. Newton and deter others from engaging in similar future conduct.

WHEREFORE, the Plaintiff G.H. demands judgment against Defendant Dr. Newton for the above-described damages, plus punitive damages, attorney's fees, costs, interest, and further relief to which they are entitled.

COUNT V
NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
AGAINST DEFENDANT DR. ALICE NEWTON

96. Plaintiff repeats and incorporates herein the foregoing paragraphs as if each were set forth here in its entirety.

97. This is a claim of J.S.H. as legal guardian and on behalf of the minor child known as G.H. against the Defendant, Alice Newton.

98. Defendant Newton did intentionally engage in conduct towards the Plaintiff that was extreme and outrageous and that Defendant knew, or should have known, was such conduct likely to cause the Plaintiff severe emotional distress and personal injury if continued.

99. As a direct, proximate and foreseeable result of Defendant Dr. Newton's extreme and outrageous conduct against G.H., G.H. has suffered and continues to suffer general damages including but not limited to significant and enduring emotional distress including humiliation, mental anguish and physical distress, injury to mind and body, in a sum to be proven at trial, in excess of the minimum jurisdictional requirements of this Court.

WHEREFORE, the Plaintiff G.H. demands judgment against Defendant Dr. Newton for the above-described damages, plus punitive damages, attorney's fees, costs, interest, and further relief to which they are entitled.

## CLAIMS OF THE PLAINTIFF J.S.H., IN HER INDIVIDUAL CAPACITY

### COUNT VI
### VIOLATIONS OF 42 U.S.C. § 12182(b)(E) TITLE III OF THE ADA, AS AMENDED BY THE AMENDMENTS ACT OF 2008 ("ADAA")
(AGAINST ALL DEFENDANTS)

100.    Plaintiff repeats and incorporates herein the foregoing paragraphs as if each were set forth here in its entirety.

101.    This is a claim of J.S.H. in her individual capacity against the Defendants, Alice Newton, Jane and/or John Doe, and Massachusetts General Hospital.

102.    At all times relevant to this Complaint, G.H. was an individual with a known qualified disability within the meaning of the ADAA, and J.S.H. was an individual

known by the Defendants to be associated and in a familial relationship with G.H. and, as such, J.S.H. was entitled to all the rights and protections afforded under Title III of the ADAA, including but not limited to the right to be free from discrimination and harassment on the basis of that association by way of a pattern, policy, or practice that prevents, denies, and/or excludes her equal access to the goods, services, and/or opportunities provided by the Defendants at their place of public accommodation.

103.    At all times relevant to this Complaint, Massachusetts General Hospital was, and still is, a place of public accommodation as governed under Title III of the ADAA.

104.    For the reasons previously stated herein, Dr. Newton, John and/or Jane Doe, and Massachusetts General Hospital violated J.S.H.'s rights under Title III of the ADAA and harassed and discriminated against J.S.H. based on her association and relationship with her disabled son, G.H., and in effect denied and/or deterred her access to the services, treatments, and/or privileges available at MGH.

105.    As a direct and proximate result of the Defendants' violations of J.S.H.'s rights under the ADAA to be free from discrimination due to association and/or relationship with a disabled individual, J.S.H. has suffered and continues to suffer significant harm.

WHEREFORE, the Plaintiff J.S.H. demands judgment against Defendants Dr. Newton, John and/or Jane Doe, and Massachusetts General Hospital for injunctive relief, attorney's fees and litigation costs, and further relief to which they are entitled.

<u>COUNT VII</u>
<u>VIOLATION OF 42 U.S.C. § 1985 (2) - CONSPIRACY TO INTIMIDATE A WITNESS</u>
(AGAINST ALL DEFENDANTS)

106.    Plaintiff repeats and incorporates herein the foregoing paragraphs as if each
were set forth here in its entirety.

107.    This is a claim of J.S.H. in her individual capacity against the Defendants, Alice
Newton, Jane and/or John Doe, and Massachusetts General Hospital.

108.    For the reasons stated previously, Defendants Dr. Newton and John and/or Jane
Doe conspired, directly or indirectly, for the purpose of cloaking Defendant Dr.
Newton's conduct and preventing J.S.H. and G.H.'s doctors from testifying about the
events described herein due to the peer review privilege in an effort to shield
themselves and/or MGH from liability for the violations of the Plaintiffs rights and
they did so with invidiously discriminatory animus on J.S.H.'s caregiver status to a
medically complex child.

109.    To the extent that Defendant Dr. Newton was acting outside the scope of her
employment when she unlawfully accessed G.H.'s medical chart in the MGH system,
Defendant Massachusetts General Hospital also participated in the above-described
conspiracy by doing nothing to halt Defendant Dr. Newton's conduct towards the
family, and cloaking the complaints and subsequent "investigation" under the secrecy
of a peer review privilege proceeding – which was conducted under the supervision
of lawyers in the hospital's Risk Management Division.

110.    Accordingly, the Defendants conspired for the purpose of impeding, hindering,
obstructing, or defeating the due course of justice in the Massachusetts Superior

Court with the intent to deny J.S.H. and G.H., as a person with a disability, the equal

protection of the laws.

111.     The misconduct described in in this count was undertaken with malice,

willfulness, and reckless indifference to the rights of others.

WHEREFORE, the Plaintiff J.S.H. demands judgment against Defendants Dr. Newton,

John and/or Jane Doe, and Massachusetts General Hospital for the above-described damages,

plus punitive damages, attorney's fees, costs, interest, and further relief to which they are

entitled.

COUNT VIII
INTENTIONAL INFLICTION OF EXTREME EMOTIONAL DISTRESS
(AGAINST DEFENDANT ALICE NEWTON)

112.     Plaintiff repeats and incorporates herein the foregoing paragraphs as if each

were set forth here in its entirety.

113.     This is a claim of J.S.H. in her individual capacity against the Defendant, Alice

Newton.

114.     As previously described herein, Defendant Alice Newton did intentionally and/or

recklessly subject the Plaintiff to conduct that was extreme, outrageous, shocking to

the conscience, and utterly intolerable in civilized society that no reasonable person

should be or could be expected to endure.

115.     As a direct and proximate result of Dr. Newton's extreme and outrageous

intentional conduct, J.S.H. has suffered and continues to suffer significant damages,

including but not limited to severe and enduring emotional distress manifesting in

physical injury, anxiety, among other symptoms.

116.     Dr. Newton's outrageous conduct resulted in emotional distress to J.S.H.  Her

actions were fraudulent, malicious, and oppressive.  J.S.H. is thus entitled to and

herein seeks punitive and exemplary damages from Dr. Newton, in an amount

according to proof at trial, to punish Dr. Newton and deter others from engaging in

similar future conduct.

WHEREFORE, the Plaintiff J.S.H. demands judgment against Defendant Dr. Newton for

the above-described damages, plus punitive damages, attorney's fees, costs, interest, and

further relief to which they are entitled.

<u>COUNT IX</u>
<u>NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS</u>
<u>AGAINST DEFENDANT DR. ALICE NEWTON</u>

117.     Plaintiff repeats and incorporates herein the foregoing paragraphs as if each

were set forth here in its entirety.

118.     This is a claim of J.S.H. in her individual capacity against the Defendant, Alice

Newton.

119.     Defendant Newton did intentionally engage in conduct towards the Plaintiff that

was extreme and outrageous and that Defendant knew, or should have known, was

such conduct likely to cause the Plaintiff severe emotional distress and personal

injury if continued.

120.     As a direct, proximate and foreseeable result of Defendant Dr. Newton's extreme

and outrageous conduct against J.S.H., she has suffered and continues to suffer

general damages including but not limited to significant and enduring emotional

distress including humiliation, mental anguish and physical distress, injury to mind

and body, in a sum to be proven at trial, in excess of the minimum jurisdictional

requirements of this Court.

WHEREFORE, the Plaintiff J.S.H. demands judgment against Defendant Dr. Newton for

the above-described damages, plus punitive damages, attorney's fees, costs, interest, and

further relief to which they are entitled.


### SPECIFIC PRAYER FOR INJUNCTIVE RELIEF

For the Defendants' disability discrimination against the Plaintiffs under the ADAA, the

Plaintiffs respectfully request that the Court grant the following relief:

a.  Enter Judgment in Plaintiffs' favor;

b.  Declare Defendants' conduct to be a violation of Plaintiffs' rights under the ADAA;

c.  Enjoin the Defendants, and their agents, successors, employees, and those acting in

concert with them from continuing to violate the rights of patients with disabilities;

d.  Permanently enjoin Defendant Newton from accessing G.H.'s medical record absent

a signed authorization from J.S.H. and/or G.H.'s biological father;

e.  Permanently enjoin Defendant Newton from retaliation and/or harassment of J.S.H.

and G.H., from contacting J.S.H. or G.H. directly or indirectly, from directly or

indirectly contacting medical providers who treat G.H. regarding G.H.'s medical

condition, and from taking any action that interferes with G.H.'s care and treatment;

f.  Order MGH's Child Protection Team, including Defendant Newton, to undergo

annual training and educational instruction on patients' presentation,

symptomology, and treatment in the context of medically complex diagnoses, such as Mitochondrial Disorders; and

g. Award Plaintiffs their attorney's fees and litigation costs in bringing these claims.

**The Plaintiffs demand a jury trial on all claims so triable.**

Respectfully Submitted,
The Plaintiffs,
By their attorneys,

**/s/ John T. Martin**
John T. Martin; BBO # 676344
jmartin@kjclawfirm.com
Michaela M. Weaver; BBO # 705985
mweaver@kjclawfirm.com
KJC Law Firm, LLC
One Exchange Place, 2nd Level
Worcester, MA 01609
(617) 720-8447

Dated: January 5, 2022

CERTIFICATE OF SERVICE

I hereby certify that on January 5, 2022, the foregoing document was filed electronically through the CM/ECF system and was served upon all registered participants in this case, as identified in the Notice of Electronic Filing (NEF).

**/s/ John Martin**