# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **J.S.H., in her Individual Capacity, and as Legal Guardian and on Behalf of Minor Child Known as G.H.,** )<br>)<br>)<br>)<br>)<br>**Plaintiffs,** )<br>)<br>**v.** )<br>)<br>**ALICE NEWTON, JANE and/or JOHN DOE, MASSACHUSETTS GENERAL HOSPITAL,** )<br>)<br>)<br>)<br>**Defendants.** )<br>) | **CIVIL ACTION NO.  4:21-40086-TSH** |

## ORDER AND MEMORANDUM ON DEFENDANTS' MOTION TO DISMISS (Docket No. 24)

### 2/1/2023

**HILLMAN, D.J.**

J.S.H. and her son, G.H. ("plaintiffs"), bring suit against Dr. Alice Newton ("Dr. Newton"), John / Jane Doe ("John Doe") and Massachusetts General Hospital ("MGH") (collectively "defendants"), alleging violations of federal civil rights laws and common law torts.[1] Defendants move to dismiss for failure to state a claim. (Docket No. 24). For the following reasons, the Court **_grants_** in part and **_denies_** in part their motion.

---

[1] **Count I**: J.S.H., on behalf of G.H., alleges a violation of Title III of the ADA against all defendants; **Count II**: J.S.H., on behalf of G.H., alleges a violation of Section 504 of the Rehabilitation Act against all defendants; **Count III**: J.S.H., on behalf of G.H., alleges a violation of 42 U.S.C. § 1985(2) against Dr. Newton; **Count IV**: J.S.H., on behalf of G.H., alleges intentional infliction of extreme emotional distress against Dr. Newton; **Count V**: J.S.H., on behalf of G.H., alleges negligent infliction of emotional distress against Dr. Newton; **Count VI**: J.S.H., in her individual capacity, alleges violations of Tittle III of the ADA against all defendants; **Count VII**: J.S.H., in her individual capacity, alleges a violation of 42 U.S.C. § 1985(2) against Dr. Newton; **Count VIII**: J.S.H., in her individual capacity,

1

**Background**

*1. Mito and J.S.H. and Dr. Newton's history*

The following facts, taken from the complaint, are accepted as true. *See Rosenberg v. City of Everett*, 328 F.3d 12, 15 (1st Cir. 2003). Mitochondrial Dysfunction ("Mito") is a complex and often genetic medical condition that is often a source of diagnostic frustration due to significant limitations on the ability to objectively confirm a diagnosis and the inconsistency of the condition's presentation. (Am. Comp. at ¶¶ 10-11). Mito adversely affects the body's mitochondria, which oxidizes food and converts nutrients into energy for the cell. (*Id.* at ¶ 10). Prior to 2017-2018, there was no consistent or established standard of diagnosis. (*Id.* at ¶ 12). This leads to confusion and disagreements between medical teams as to the appropriate course of treatment for patients with Mito, and parents of children with Mito are often vulnerable to wrongful accusations of child abuse and neglect. (*Id.* at ¶¶ 13-16).

G.H., J.S.H.'s biological son, is a twelve-year-old who suffers from serious and potentially fatal medical illnesses, which render him completely disabled and require extensive and ongoing medical treatment and specialized services. (*Id.* at ¶ 8). At some point prior to 2017-2018 G.H.'s doctors suspected that his disability was caused by Mito; the complaint is not clear whether Mito is still a suspected cause, but it notes that there is no unifying or confirmed diagnosis for his condition. (*Id.* at ¶¶ 18-19).

In 2011 J.S.H.'s first child died of a Mito disorder at age four, after a seven-month hospitalization at Boston Children's Hospital ("BCH"). (*Id.* at ¶ 21). An ethics review conducted by BCH after the death concluded that both the parents and the medical team acted appropriately in the care and treatment of the child. (*Id.* at ¶¶ 21-23). At some point between June and

---

alleges intentional infliction of extreme emotional distress against Dr. Newton; **Count IX**: J.S.H., in her individual capacity, alleges negligent infliction of emotional distress against Dr. Newton.

November 2011, G.H., three years old at the time, began exhibiting complex health symptoms and began receiving treatment at BCH. (*Id.* at ¶ 24). At that time, Dr. Newton was the head of the Child Protection Team at BCH and very familiar with both J.S.H. and G.H. (*Id.* at ¶ 25).  In November 2011, Dr. Newton filed a "51A report"[2] with the Massachusetts Department of Children and Families ("DCF") accusing J.S.H. of faking G.H.'s disability and subjecting him to unnecessary and painful medical treatments; DCF found the allegations of abuse "unsubstantiated." (*Id.* at ¶ 26).

After this report, J.S.H. arranged for G.H. to receive his medical treatment from Tufts. (*Id.* at ¶ 27). However, Dr. Newton continued to file additional 51A reports despite having no affiliation with Tufts. This led to lengthy diagnostic protocols in which G.H.'s treatment would be temporarily stopped to determine whether his condition was organic and medical, or as alleged by Dr. Newton, the result of abuse at the hands of J.S.H. (*Id.* at ¶¶ 28-29).  While treatment was removed, J.S.H. was only allowed to have limited and supervised contact with G.H. (*Id.* at ¶ 30). This apparently occurred more than once, and in each instance DCF found the allegations unsubstantiated and the medical team concluded the condition was medical, not the product of abuse. (*Id.* at ¶ 31).  The complaint is not clear how long or how many of those reports were filed, but it alleges that from 2011 until August 2018, J.S.H. and G.H. had no contact with Dr. Newton. (*Id.* at ¶ 32).

### 2. Dr. Newton's 2018 allegations

---

[2] A "51A Report" refers to a report that is required to be filed by a "mandated reporter" under M. G. L. c. 119, § 51A when the mandated reporter "has reasonable cause to believe that a child is suffering physical or emotional injury resulting from" various kinds of abuse.

In July of 2018, J.S.H. was identified as a witness in an unrelated state court trial where she would testify about Dr. Newton's propensity for making unfounded allegations of abuse against parents of children with Mito. (*Id.* at ¶ 36-37).

By August of 2018, Dr. Newton was the Medical Director of the Child Protection Program at Massachusetts General Hospital ("MGH"). (*Id.* at ¶ 34). At this time, G.H. was a patient (among many other doctors) of a gastroenterologist at a satellite location of MGH in western Massachusetts. G.H. was also a patient of UMASS Hospital. (*Id.* at ¶ 35). Sometime between July and September of 2018, Dr. Newton contacted G.H.'s medical team via text messages, email, and phone calls requesting that they request a consultation with her and the MGH Child Protection Team based on her concerns that J.S.H. was abusing G.H; the medical team refused. (*Id.* at ¶¶ 39, 41).

Dr. Newton wrote a letter dated September 7, 2018 which was sent to G.H.'s medical providers as well as the Child Abuse Pediatrics team at UMASS Hospital claiming that one of G.H.'s doctors requested a child abuse consultation, suggested that J.S.H. caused the death of her first child (without disclosing the ethics review), and repeated her allegations that J.S.H. was abusing G.H. Dr. Newton went on to encourage the providers to file 51A reports against J.S.H., but none did so. (*Id.* at ¶¶ 42-48).

Sometime thereafter, G.H.'s gastroenterologist and primary care doctors filed internal complaints about Dr. Newton to MGH. (*Id.* at ¶ 58-59). This initiated a privileged "peer review" process whose details are unavailable to the plaintiffs, but the plaintiffs allege that no action was ever taken against Dr. Newton. (*Id.* at ¶¶ 60-65). There is also a reference in the complaint to a "Jane and/or John Doe" who allegedly used the peer review process to cover up Dr. Newton's letter. (*Id.* at ¶ 69).

4

Sometime after the internal complaints and the peer review investigation had begun, Dr. Newton filed another 51A report, largely tracking the allegations in the letter that J.S.H. was responsible for her first child's death, and that J.S.H. was duping G.H.'s medical providers into giving him unnecessary medical care. (*Id.* at ¶¶ 50-51). This led to an investigation by DCF that included home visits, interviews with medical providers and Dr. Newton, and which was closed as unsubstantiated. (*Id.* at ¶ 52-53).

The letter Dr. Newton sent to G.H.'s providers on September 7, 2018, is now part of G.H.'s medical record, at least at UMASS. (*Id.* at ¶¶ 54-56). The letter causes providers unfamiliar with the case to subject J.S.H. to heightened levels of scrutiny, delays in services, and sometimes hostility when they treat G.H. (*Id.* at ¶ 56).

## Standard of Review

In evaluating a Rule 12(b)(6) motion to dismiss, the court must determine "whether, construing the well-pleaded facts of the complaint in the light most favorable to the plaintiff[], the complaint states a claim for which relief can be granted." *Cortés-Ramos v. Martin-Morales*, 956 F.3d 36, 41 (1st Cir. 2020) (quoting *Ocasio-Hernández v. Fortuño-Burset*, 640 F.3d 1, 7 (1st Cir. 2011)). The complaint must allege "a plausible entitlement to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 559 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id.* at 679.

## Analysis

*1. The general sufficiency of the complaint*

5

The defendants argue that the complaint is too long and does not give them sufficient notice as to the claims pleaded against them. Although the complaint could be clearer, it contains a narrative and a set of enumerated legal claims relating to that narrative. "Pleadings must be construed so as to do justice." F.R.C.P. Rule 8(e). The Court will not dismiss on those grounds.

### 2. Pseudonymity

The Court also declines to dismiss a complaint on the grounds that no motion for pseudonymity was made. Both the original and amended complaints were filed prior to the First Circuit's decisions in *Does 1-3 v. Mills*, 39 F.4th 20, 25 (1st Cir. 2022) ("recognizing the strong presumption against the use of pseudonyms in civil litigation"), and *Doe v. Massachusetts Institute of Technology*, 46 F.4th 61, 72-73 (1st Cir. 2022) (outlining the test for determining when that presumption is overcome). However, the Court invites further briefing on this issue consistent with those decisions.

### 3. Statute of Limitations

The defendants argue that conduct prior to 2018 cannot be the basis for liability as it is barred by the statute of limitations. The plaintiffs bring claims based on federal causes of action alleging disability discrimination and claims based on state common law torts.[3]

For federal causes of action, courts generally borrow analogous state law statutes of limitation, usually from personal injury statutes. *Nieves-Marquez v. Puerto Rico*, 353 F.3d 108, 118-19 (1st Cir. 2003). However, if a cause of action "arises under" a congressional act enacted after December 1, 1990, the statute of limitation is the four-year limitation under 28 U.S.C. § 1658. *Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 382 (2004). The question is whether the cause of action was "made possible" by the post-1990 enactment. *Id.* at 382-83.

---

[3] The plaintiffs' 42 U.S.C. § 1985 causes of action, as discussed below, fail as a matter of law.

"Section 504"[4] claims are governed by state law because none of the post-1990 amendments to the act touch on the issues here. Similarly, while the Americans with Disabilities Act ("ADA") was significantly amended in 2008, those amendments do not affect the "Title III"[5] claims in this litigation.[6] Accordingly, the Court will borrow from analogous state law. Whether this Court refers to the personal injury statute, M. G. L. c. 260, § 2A, or the state anti-discrimination statute, M. G. L. c. 151B § 9,[7] the term is three years. The emotional distress claims are governed by the personal injury statute. *Mellinger v. Town of W. Springfield*, 401 Mass. 188, 191, 515 N.E.2d 584, 586 (1987) (IIED); *Cimino v. Milford Keg, Inc.*, 385 Mass. 323, 333, 431 N.E.2d 920, 927 (1982) (NIED). Therefore, all claims are governed by a three-year statute of limitations and must have accrued after August 10, 2018 (the complaint was filed August 10, 2021). Because, as discussed below, the claims against MGH proceed on theories of vicarious liability or deliberate indifference, and the conduct alleged by John Doe post-dates Dr. Newton's actions, the analysis is limited to the claims against Dr. Newton.

For the federal claims, accrual begins "when the aggrieved party knows or has reason to know of the injury which is the basis for his action." *Nieves-Marquez*, 353 F.3d at 119 (citation omitted). Here, the earliest event that could have notified the plaintiffs of their injury was the filing of the final 51A report by Dr. Newton, which instigated an investigation of plaintiffs which the plaintiffs concede they were aware of. There is no indication from the complaint that

---

[4] Codified at 29 U.S.C. § 794.

[5] Codified at 42 U.S.C. § 12182.

[6] Instead, the amendments increased the scope of a "disability." *See generally* ADA Amendments Act of 2008, P.L. 110-325, 1222 Stat. 3553. To the extent it is disputed whether G.H. is disabled, the dispute does not center on the severity of the disability, but its cause—whether it is, to use the language of the complaint, "organic," or the product of abuse. Therefore, the type of disability the amendments addressed is not at issue here.

[7] The public accommodation statute, M. G. L. c. 272, § 98, indicates it borrows procedures from the employee discrimination statute, M. G. L. c. 151B.

plaintiffs were aware, or could have been aware, of the contacts between Dr. Newton and their doctors prior to the filing. It is not clear from the complaint when the plaintiffs knew who had instigated the investigation, but this Court will assume they knew once the investigation began. Although the date of the investigation is not in the complaint, it came after the September 7, 2018 letter—and therefore the accrual occurred after August 10, 2018. Furthermore, the conduct leading up to the filing of the final 51A report (the text messages, emails, phone calls, as well as the letter) which might have occurred prior to August 10 will be considered in adjudicating the federal claims because the injury caused by that conduct did not accrue until after August 10. *See, e.g.*, *id.* at 119-120 (finding a claim timely given a 30-day statute of limitations where the accrual began shortly before the complaint was filed even though the conduct occurred nearly a year prior). However, the pre-2018 conduct cannot be considered in determining liability. Nothing in the complaint indicates that the plaintiff was unaware Dr. Newton was behind the earlier 51A reports and therefore the accrual of the federal claims for that conduct began, at the latest, in 2011.

Massachusetts courts, although proceeding under slightly different terminology, apply the same accrual standard in common law tort cases. *Albrecht v. Clifford*, 436 Mass. 706, 714-15, 767 N.E.2d 42, 49 (2002) (the "inherently unknowable" standard is identical to a "knew or should have known" standard). Thus, the same result is reached as to the state law common law torts. Alternately, Massachusetts courts recognize "continuing" tort violations. Thus, while a strict application of the three-year statute of limitations would separate the September 2018 letter and the filing of the 51A report from the informal communication between Dr. Newton and the plaintiffs' doctors prior to August 10, 2018, the alleged actions of Dr. Newton in 2018 form a continuous action of retaliation and/or discrimination against plaintiffs. *See, e.g., Doe v. Town of*

*Blandford*, 402 Mass. 831, 839, 525 N.E.2d 403, 409 (1988) ("Where the tortious conduct is a continuing event, the . . . presentment requirement is tolled."); *M.L v. S.N.*, 85 Mass. App. Ct. 1107, 5 N.E.3d 2, at \*4 (Mar. 19, 2014) (unpublished) (collecting cases from other jurisdictions and assuming the continuing tort doctrine would apply to emotional distress claims). The actions were not a series of discrete events. *See, e.g.*, *id.* (a particular instance of abuse in an abusive relationship was a discrete act, not a "continuing course of conduct."). But pre-2018 conduct cannot give rise to liability because it was not continuous with the 2018 conduct. The plaintiffs admit there was no contact between them and Dr. Newton between 2011 and 2018.

### 4.  Title III of the ADA

A Title III claim requires a plaintiff to show: "(1) [that] he or she is disabled within the meaning of the ADA; (2) that the defendants own, lease, or operate a place of public accommodation; and (3) that the defendants discriminated against the plaintiff within the meaning of the ADA." *Marradi v. Karoska Landing, Inc.*, 323 F. Supp. 3d 216, 219 (D. Mass. 2018). The defendants argue that the plaintiffs must point to a specific subsection of Title III to state a claim, but that misinterprets the statute. The statute sets out a general rule prohibiting discrimination based on disability, 42 U.S.C. § 12182(a), prohibits certain broad discriminatory actions, § 12182(b)(1)(A), and clarifies that discrimination *includes* certain types of actions, § 12182(b)(2)(A). Most cases involve specific prohibitions in Section 12182(b)(2)(A), but those are not an exhaustive list of the ways one can discriminate under the ADA. Intentional discrimination against an individual with disabilities, as alleged here, is arguably not included in the list of specific prohibitions—yet it violates the ADA.

Neither party disputes, for the purposes of this motion, that G.H. is disabled. Therefore, this analysis hinges on whether the defendants are proper subjects of an ADA claim and whether

G.H. has been discriminated against on the basis of his disability. This does not require a showing of animus. "The ADA and Section 504 specifically prohibit discrimination against the handicapped, not just based on invidious 'affirmative animus,' but also based on thoughtlessness, apathy and stereotypes about disabled persons." *Guckenberger v. Boston University*, 974 F. Supp. 106, 134 (D. Mass. 1997).

### a.   *Dr. Newton*

### i.   *The substantive violation against G.H.*

"It shall be discriminatory to subject an individual . . . on the basis of a disability . . . to a denial of the opportunity of the individual [] to participate in or benefit from the goods, services, facilities, [etc.] of an entity." 42 U.S.C. § 12182(b)(1)(A)(i). The complaint gives rise to the inference that the goal of the letters and 51A report was to deprive G.H. of treatment for his disability. That meets the standard for discrimination under Title III.

The presence of multiple motives does not defeat the claim, especially here, where the defendant was allegedly trying to prevent J.S.H. from giving testimony as to Dr. Newton's alleged prior discrimination against children with Mito and their families. Retaliating against someone (or someone associated) with a disability, *because* they are advocating against *your* alleged discrimination against people with that disability, is discrimination based on disability.

However, Title III offers only injunctive and therefore prospective relief. *Dudley v. Hannaford Bros. Co.*, 333 F.3d 299, 304 (1st Cir. 2003) (a Title III claim "requires some ongoing harm (or, at least, a colorable threat of future harm)"); *see also G. v. Fay School*, 931 F.3d 1, 9 (1st Cir. 2019) (Title III claims are restricted to "forward-looking" relief). Any harm related to the investigation of J.S.H. triggered by the 51A report cannot be redressed by an injunction because the plaintiffs concede that the investigation is over. Similarly, while there

may be ongoing harm from the letter in G.H.'s medical file, the plaintiffs do not seek relief against UMASS. Instead, the complaint can be plausibly read to allege that J.S.H. is deterred from using MGH facilities for G.H.'s care to the full extent she otherwise would out of fear that doing so will incur additional allegations of child abuse from Dr. Newton. Thus, G.H. is functionally deterred from accessing those facilities due to his disability.[8]

There is no requirement that a disabled person "subject himself to repeated instances of discrimination in order to invoke the remedial framework of Title III of the ADA." *Dudley*, 333 F.3d at 305. The question is not whether the plaintiff has a definite plan to return, but whether they are likely to, absent the barrier. *Id.* at 306. And, courts should "resolve doubts about" whether there is "a sufficient probability of a repeat occurrence" of the discrimination in favor of plaintiffs. *Id.* at 307. Unlike in *Dudley*, where the store had a policy that required it to refuse service to the plaintiff, *id.* at 306, this Court cannot say that Dr. Newton has a "policy" of filing 51A reports against J.S.H. However, given the history alleged—including the pre-2018 conduct—J.S.H.'s fear is credible and it is credible that J.S.H. would make additional use of MGH facilities if she knew that Dr. Newton could not access G.H.'s medical file.

Finally, the requested injunctive relief is prospective: plaintiffs request an injunction that would prevent Dr. Newton from accessing G.H.'s medical record absent authorization from one of his parents and from contacting other doctors about G.H.'s care. That injunction would remedy any ongoing harm. Therefore, the plaintiffs have alleged a violation of the ADA that could plausibly give rise to injunctive relief.

---

[8] The defendants do not allege, other than arguing that the complaint is not specific enough, that J.S.H. has not alleged associational discrimination. Under 42 U.S.C. § 12182(b)(1)(E) it is "discriminatory to exclude . . . an individual or entity because of the known disability of an individual with whom the individual or entity is known to have a relationship or association." J.S.H. is deterred from accessing facilities on her son's behalf out of fear that she will be subject to allegations of child abuse *because* of her son's disability. That is consistent with the statutory text.

*ii.   The applicability of Title III to Dr. Newton*

The First Circuit has yet to definitively decide if Title III applies to individuals. However, a court in this district has held that "[n]early every court that has decided the issue of individual liability under Title III has found that individuals can be held responsible for violations of these prohibitions against discrimination if they own, lease or lease to, or operate a place of public accommodation." *Guckenberger v. Boston Univ.*, 957 F. Supp. 306, 322 (D. Mass. 1997) (collecting cases). The parties agree for the purposes of the motion that MGH is a public accommodation. Therefore, the question is whether Dr. Newton "operate[s]" it.

In determining whether someone is an operator, courts in this district consider whether (a) the defendant is in a position of authority; (b) within the ambit of this authority the defendant has both the power and discretion to perform potentially discriminatory acts; and (c) the discriminatory acts are the result of the exercise of the individual's own discretion, as opposed to the implementation of institutional policy or the mandates of superiors." *Id.* at 322-33 (citing *Howe v. Hull*, 874 F. Supp. 779, 788 (N.D. Ohio 1994)).

Dr. Newton is the Medical Director of the Child Protection Program at MGH. Those who direct programs have discretion to institute policies, including potentially discriminatory ones, and there is no allegation that Dr. Newton was ordered to write the letter or file the reports. This prong is intended to distinguish between actors who institute discriminatory policies and those that implement them; if they are merely implementing the policy, the entity itself is the correct target of a Title III suit. But read literally, it could be used to extend Title III liability to any individual who, in a position of power, takes a discriminatory action that *any* employee could take, even one that was not in a position of authority.

12

Therefore, it is critical that Dr. Newton took these actions as the Medical Director of the Child Protection Program. She was not merely exercising the discretion that all doctors have (indeed, all people have) to file 51A reports or write letters; her job is to ensure the safety of children treated at MGH facilities and she was acting in *that* capacity when she took the allegedly discriminatory action. The Court reads the final prong of the test, "exercise of the individual's own discretion," to mean only the discretion she wields *within* "the ambit of [her] authority." Therefore, Dr. Newton's actions put her in the domain of the ADA.

The defendant's motions to dismiss the ADA claims against Dr. Newton are *denied.*

### b.   John Doe

As discussed above, Title III only allows for injunctive relief. None of the requested injunctive relief is targeted against John Doe.

Therefore, the motion to dismiss the Title III claim against John Doe is *granted*.

### c.   MGH

Plaintiffs allege that MGH failed to investigate the internal complaints against Dr. Newton or only conducted a "sham" investigation. Therefore, the Title III claims may go forward on two theories, that MGH's actions violated Title III or that MGH is vicariously liable. Because MGH is vicariously liable under traditional agency principles, the first ground is not necessary to reach.

MGH fails to develop an argument that they are not vicariously liable for the discriminatory acts of their employees under Title III. It argues that the complaint fails to allege specific acts against it, implying it believes vicarious liability is unavailable. Courts in this circuit have held that organizations may be vicariously liable under Title III for the actions of their employees when they act pursuant to an official policy. *See, e.g.*, *Dudley*, 333 F.3d at 307. But

there is no allegation that MGH had a policy of encouraging discrimination against patients with Mito disorders.

Other circuits interpreting other sections of the ADA (Title II) and Section 504 have held that vicarious liability is not available under those statutes in analogous situations. *Ingram v. Kubik*, 30 F.4th 1241, 1256-59 (11th Cir.), *cert. dismissed*, 142 S. Ct. 2855 (2022) (Title II); *Jones v. City of Detroit*, 20 F.4th 1117, 1121-22 (6th Cir. 2021) (Section 504 and Title II); *Liese v. Indian River Cnty. Hosp. Dist.*, 701 F.3d 334, 347-49 (11th Cir. 2012) (Section 504); *contra Barnhouse v. City of Muncie*, 499 F. Supp. 3d 578, 599 (S.D. Ind. 2020) (collecting contrary cases from the Fourth, Fifth, Seventh, and Ninth Circuits). There is no First Circuit case law on this question. *Gray v. Cummings*, 917 F.3d 1, 17 (1st Cir. 2019).

Those decisions rely on the Supreme Court's decision in *Gebser v. Lago Vista Independent School District*, 524 U.S. 274 (1998). That case is inapposite to Title III. As an initial matter, the right of action under Title III is statutory, so the entire analysis of *Gebser*—which is premised on the Court's ability to modify an implied right of action—is inapplicable. *Id.* at 284; *see* 42 U.S.C. §§ 12188(a), 2000a-3. Furthermore, Title III is not Spending Clause legislation, which the Supreme Court spent time discussing in *Gebser*. 524 U.S. at 287-88. Finally, Title III only allows injunctive relief, not damages; the *Gebser* Court continuously referenced the difficulties with allowing damages in its analysis. Therefore, there is no reason to adopt the *Gebser* standard of actual knowledge and deliberate indifference for Title III claims.

Keeping in mind that only individuals that pass the *Guckenberger* test can be liable under Title III, standard agency rules apply. *Cf. Vance v. Ball State Univ.*, 570 U.S. 421, 431-32 (2013) (only allowing liability for the acts of "supervisors" in employment discrimination suits). Dr. Newton was acting within the scope of her employment as director of the Child Protection Team

14

at MGH when she wrote the letter to G.H.'s medical team and filed the 51A report. Although the letter was informal, it included an allegation that one of the doctors had requested a child abuse consultation. And, as discussed below, Dr. Newton argues she cannot be held liable for a 51A report she filed in the course of her employment as a mandated reporter. Under agency principles, MGH is arguably liable for Dr. Newton's conduct.

Nor is this duplicative of any liability that Dr. Newton may be subject to. The injunctive relief requested for the two parties is distinct: the relief against Dr. Newton is to prevent her from interfering with G.H.'s medical treatment; the relief against MGH is to provide its Child Protection Team training on Mito disorders. Both defendants must be parties to the suit for the relief to be granted.

The motion to dismiss the ADA claim against MGH is *denied*.

### 5.   Section 504 of the Rehabilitation Act

To make out a Section 504 claim, plaintiff must show: "(1) that [he] is disabled; (2) that [he] sought services from a federally funded entity; (3) that [he] was 'otherwise qualified' to receive those services; and (4) that [he] was denied those services 'solely by reason of [his] ... disability.'" *Lesley v. Hee Man Chie*, 250 F.3d 47, 52–53 (1st Cir. 2001) (citations omitted).

Unlike Title III, Section 504 allows damages. *Steir v. Girl Scouts of the USA*, 383 F.3d 7, 12 (1st Cir. 2004). This alters the redressability analysis because there are harms in this case that are not cognizable under Title III which may be redressed with compensatory damages.[9] Also, the prong that determines coverage is distinct ("federally funded entity" versus "public accommodation") which has consequences for its applicability to individuals.

### a.   Dr. Newton and John Doe

---

[9] Punitive damages are not available under Section 504. *See generally Barnes v. Gorman*, 536 U.S. 181 (2002).

The Title III analysis satisfies prongs (1), (3) and (4). Defendants point to case law that cautions against using Section 504 to interfere with the reasonable judgment of a doctor in denying treatment. *See, e.g.*, *Lesley*, 250 F.3d at 58. Even accepting the awkward framing of this action as a "denial of treatment," case, the complaint plausibly alleges that this is the type of decision that "was so unreasonable—in the sense of being arbitrary and capricious—as to imply that it was pretext for some discriminatory motive." *McCauley v. Groblewski*, No. 18-cv-2167, 2020 WL 6265069, at *7 (1st Cir. July 28, 2020). As discussed below in the 51A immunity argument, the complaint sufficiently alleges these actions were taken in bad faith. However, the second prong is fatal to Dr. Newton's liability under Section 504.

In this circuit, Section 504 claims are available against individuals who *personally* accept federal funds. *Lesley*, 250 F.3d at 53. There is no requirement that they accept the federal funds to treat the individual in question, nor that they have the authority to accept or deny funds on behalf of the institution where the plaintiff is treated. *Lesley v. Chie*, 81 F. Supp. 2d 217, 222-23 (D. Mass. 2000). However, liability does not extend to all employees who work at institutions that accept federal funds. *Glanz v. Vernick*, 756 F. Supp. 632, 637 (D. Mass. 1991); *cf. Brady v. Weeks Med. Ctr.*, No. 19-cv-00655-SM, 2019 WL 6529870, at *5 (D.N.H. Nov. 12, 2019), *rep. & rec. approved*, No. 19-cv-655-SM, 2019 WL 6529459 (D.N.H. Dec. 4, 2019) (conducting a similar analysis in the context of Title VI).

Here, the only allegations against Dr. Newton are in her capacity as an employee of MGH. There is no allegation she maintains a practice where she personally accepts federal funds. Therefore, she cannot be held liable under Section 504. Similarly, there is no allegation that John Doe personally accepts federal funds.

Therefore, the motion to dismiss the Section 504 claims against Dr. Newton and John Doe are *granted*.

### b.   MGH

There is no dispute that MGH accepts federal funds. However, the analysis above only concerns alleged discrimination by Dr. Newton, not by MGH. As above, because MGH can be held responsible for the discriminatory acts of its employees under Section 504 this Court declines to decide whether the allegations make out a case of primary liability.

As discussed above, the status of vicarious liability in Section 504 cases is unresolved in the First Circuit. A court in this district has found that allowing vicarious liability under Section 504 is justified by the aims of that statute, namely "to eliminate discrimination against the handicapped." *Glanz*, 756 F. Supp. at 636-37 (citing *Patton v. Dumpson*, 498 F. Supp. 933, 943 (S.D.N.Y. 1980)).

However, *Glanz* was decided prior to the Supreme Court's decision in *Gebser*. And unlike Title III, Section 504 is predicated on the Spending Clause, allows for damages, and does so via an implied right of action—just like Title IX, the focus of the Court's decision in *Gebser*. Two circuits have noted those similarities in holding there is no vicarious liability in Section 504 claims. *Ingram*, 30 F.4th at 1257-58; *Jones*, 20 F.4th at 1121; *see also United States v. Cnty. of Maricopa*, 889 F.3d 648, 652 n. 2 (suggesting that vicarious liability in Title VI, which Section 504 references in determining its scope of remedies, is foreclosed by *Gebser*). However, the Supreme Court has acknowledged the issue is an open question in a case after *Gebser*. *City and Cnty. of San Francisco v. Sheehan*, 575 U.S. 600, 610 (2015). Finding *Ingram* and *Jones* persuasive interpretations of *Gebser* with regard to Section 504, the Court proceeds under the

assumption that *Gebser* controls the standard of vicarious liability under Section 504. Under

*Gebser*, an institution cannot be held liable in cases that:

> do not involve official policy of the recipient entity . . . unless an official who at a
> minimum has authority to address the alleged discrimination and to institute
> corrective measures on the recipient's behalf has actual knowledge of
> discrimination in the recipient's programs and fails adequately to respond.

524 U.S. at 290. In such cases, a response is inadequate if it amounts "to deliberate indifference

to discrimination." *Id.*

Here, actual knowledge is alleged because of the internal complaints against Dr. Newton

and the "peer review" process that ensued. Even though plaintiffs do not identify a particular

official, this Court finds the allegations sufficient to establish that the process was overseen by an

official with "authority to address the alleged discrimination." Thus, the analysis hinges on

deliberate indifference.[10]

Deliberate indifference "is not a mere 'reasonableness' standard." *Davis ex rel. La

Shonda D. v. Monroe Cnty. Bd. Of Educ.*, 526 U.S. 629, 649 (1999). It is an objective test:

"whether the institution's response, evaluated in light of the known circumstances, is so deficient

to be clearly unreasonable." *Fitzgerald v. Barnstable Sch. Comm.*, 504 F.3d 165, 174 (1st Cir.

2007) *rev'd on other grounds*, 555 U.S. 246 (2009). Although it does not require a showing of

discrimination after actual notice is received, it does require the indifference to at least cause the

defendant to be "more liable or vulnerable" to it. *Doe v. Pawtucket Sch. Dep't*, 969 F.3d 1, 9 (1st

Cir. 2020).

---

[10] The First Circuit uses a five-factor test in Title IX cases based on *Gebser*. *Doe v. Brown Univ.*,
896 F.3d 127, 130 (1st Cir. 2018). The first two factors deal with a discrimination standard foreign to
Section 504, the third factor is actual knowledge, the fourth factor is that the discrimination occurred "in
the funding recipient's programs or activities," *id.*, which is met here, and the fifth factor is deliberate
indifference.

When an organization investigates and responds in some way to a complaint of discrimination (or in Title IX, harassment), courts are reluctant to find deliberate indifference even if the response is imperfect. *See, e.g.*, *Porto v. Town of Tewksbury*, 488 F.3d 67, 74-75 (1st Cir. 2007). But when an organization does nothing, *Pawtucket*, 969 F.3d at 9-10, or fails to update remedial actions that are proven to be insufficient, *Wills v. Brown University*, 184 F.3d 20, 26 (1st Cir. 1999), courts may find them liable.

At least at the motion to dismiss stage, dismissal would be inappropriate. *Cf. Leader v. Harvard Univ. Bd. of Overseers*, No. 16-cv-10254-DJC, 2017 WL 1064160, at *4 (D. Mass. Mar. 17, 2017). MGH initiated an investigation based on an internal complaint, but failed to take into account the alleged continuing discrimination and harms caused by the subsequent 51A report. That deliberate indifference made G.H. "more 'liable or vulnerable' to [discrimination]." *Pawtucket*, 969 F.3d at 9.

The Court understands the hesitancy MGH might have about taking disciplinary measures based on the filing of a 51A report. The Supreme Court has noted that it would "it would be entirely reasonable for a school to refrain from a form of *disciplinary* action that would expose it to constitutional or statutory claims." *Davis*, 526 U.S. at 649 (emphasis added). There are cases where failing to file a 51A report could cause an organization to incur liability. *See, e.g.*, *Booker v. City of Boston.*, No. 97-CV-12534-MEL, 2000 WL 1868180, at *3 (D. Mass. Dec. 12, 2000) (discussing Title IX liability). But here, the initial notice was not a 51A report, but a letter.

The motion to dismiss the Section 504 claims against MGH is *denied*.

### 6.  Section 1985(2) Claims

Courts must be careful to separate those parts of 42 U.S.C. § 1985 that relate to issues of federal concern from those that relate to issues of state concern. The latter are modified by a reference to "equal protection," whereas the former are not. *Kush v. Rutledge*, 460 U.S. 719, 726 (1983). Interference with witnesses in a *state* court proceeding is modified by equal protection language and, as such, requires a discriminatory, class-based animus. *Id.* at 725.  Animus toward individuals with disabilities does not meet that standard. *Toledo v. Sanchez*, 454 F.3d 24, 33 (1st Cir. 2006) ("The disabled are not a suspect class for equal protection purposes."); *cf. Bd. of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356, 367-74 (2001). Therefore, the claims relating to Section 1985(2) fail as a matter of law.

The motion to dismiss all claims based on Section 1985(2) is *granted*.

### 7.  51A Immunity

M. G. L. c. 9, § 51A immunity cannot preempt federal claims. U.S. Const. art. VI, cl. 2. Therefore, 51A immunity may only prevent the state law emotional distress claims.

The statute in place when Dr. Newton filed the 2018 51A report controls. *Hanscom v. Madlen & Melrose Gaslight Co.*, 220 Mass. 1, 3-4, 107 N.E. 426, 427-28 (1914) (statutes are prospective unless they are explicitly retrospective or concern "practice, procedure and evidence," listing several statutory defenses that were found to be prospective). That statute reads, in relevant part:

> No mandated reporter shall be liable in any civil or criminal action for filing a report under this section or for contacting local law enforcement authorities or the child advocate, if the report or contact was made in good faith, was not frivolous, and the reporter did not cause the abuse or neglect.

2008 Mass. Legis. Serv. Ch. 176 (H.B. 4905) (current version at M. G. L. c. 119 § 51A).

Only reports filed with DCF (or, for certain reporters, their superiors) are covered by the immunity. *Hope v. Landau*, 398 Mass. 738, 739-40, 500 N.E.2d 809, 810 (1986) ("The

defendants were not entitled to summary judgment at least because they have not shown beyond dispute that the letter was sent to the Department of Social Services, an indispensable condition to immunity under § 51A.").[11] Here, the complaint alleges that the defendant sent a letter to G.H.'s care team, encouraging them to file 51A letters. That letter is not a 51A report. If Dr. Newton was in a position to know the details of this alleged abuse, she was in a position to file a 51A report directly with DCF. If any harm came from the letter, 51A immunity does not apply because the letter was not filed with DCF.

This Court cannot credit bare allegations that the 51A reports were filed in bad faith. *Cf. Iqbal*, 556 U.S. at 686-87. Bad faith—or malice—does not need to be alleged with particularity, but the plaintiffs must "lay out enough facts from which malice might reasonably be inferred." *Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 58 (1st Cir. 2012). Therefore, this Court must look to all the facts alleged in determining if there is evidence of bad faith. *Hernandez-Cuevas v. Taylor*, 723 F.3d 91, 103 (1st Cir. 2013) ("[t]he complaint should be read as a whole, not parsed piece by piece to determine whether each allegation, in isolation, is plausible").

Again, if Dr. Newton had access to information that would give rise to a 51A report, there would be no reason for her to reach out to G.H.'s care team and encourage *them* to report it. She could have—and was required by law—to file the report.[12] It is reasonable to infer that Dr. Newton understood the 51A reporting regime well. That she waited until other doctors refused to act on her informal report—and acted despite their refusal to do so, and apparently in the face of internal complaints—is circumstantial evidence that she had ulterior motives in filing the formal

---

[11] The Department of Social Services is the predecessor to DCF.

[12] A reporter who is a staff member at a "medical institution" may also notify "the person or designated agent in charge of [a medical] institution" or the "local law enforcement authorities or the child advocate"; neither of those exceptions are applicable.

51A report. *See, e.g.*, *Condez v. Civil Serv. Comm'n*, 95 Mass. App. Ct. 1116, 126 N.E.3d 1037, at *6 (2019) (unpublished).

The 51A reports prior to 2018 also support an inference of bad faith. That those reports cannot be the grounds for this suit does not mean they are irrelevant. All of Dr. Newtons pre-2018 reports were based on substantially the same allegations made in the post-2018 report (the disabilities of J.S.H.'s children were an elaborate sham) and all of them were dismissed by DCF. The complaint alleges that in 2018 nothing had changed and yet Dr. Newton attempted to have reports filed and filed reports citing substantially identical claims. Finally, the Court notes the proximity of the letter and the filing of the 51A report and the revelation that testimony would be offered against Dr. Newton by J.S.H. All of these facts make the inference that Dr. Newton made the 51A report in bad faith reasonable.

The Court agrees with the defendants that Dr. Newton was acting in her official capacity when she wrote the letter and filed the final 51A report. But there is no absolute immunity for mandated reporters who file reports pursuant to that duty. The case the defendants cite for that proposition was vacated. *Hope v. Landau*, 21 Mass. App. Ct. 240, 243, 486 N.E.2d 89, 91–92 (1985), *vacated*, 398 Mass. 738, 500 N.E.2d 809 (1986).

To be clear, repeatedly filing 51A reports against the same individual does not nullify the immunity offered by Massachusetts law. Even when the reports turn out to be unsubstantiated, the Court would not infer bad faith without something more. Here, that something more is the proximity of the filing to the revelation of testimony to be offered against Dr. Newton by J.S.H., the attempt to circumvent the 51A process by encouraging others to file, and the filing of a report after multiple doctors who were actually treating G.H. refused to do so.

Because the 51A immunity defense was the only argument defendants put forth with regard to the IIED and NIED claims, the motion to dismiss those claims is *denied*.

<u>**Conclusion**</u>

For the reasons above:

The motion to dismiss Counts I and VI, is ***<u>granted</u>*** as to John / Jane Doe, and ***<u>denied</u>*** as to Dr. Newton and MGH.

The motion to dismiss Count II is ***<u>granted</u>*** as to Dr. Newton and John / Jane Doe and ***<u>denied</u>*** as to MGH.

The motion to dismiss Counts III and VII is ***<u>granted</u>***.

The motion to dismiss Counts IV, V, VIII, and IX is ***<u>denied</u>***.


**SO ORDERED**

*<u>/s/ Timothy S. Hillman</u>*
**TIMOTHY S. HILLMAN**
**DISTRICT JUDGE**