**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| J.S.H., in her Individual Capacity, and as Legal Guardian and on Behalf of Minor Child Known as G.H., | |
| Plaintiffs, | Case No.  4:21-CV-40086-MRG |
| v. | |
| ALICE NEWTON, M.D., JANE and/or JOHN DOE, and MASSACHUSETTS GENERAL HOSPITAL, | |
| Defendants. | |

Guzman, D.J.

### Memorandum and Order

I.  **Introduction**

This case arises from a medical doctor's allegedly tortious actions towards both a (now deceased) child that suffered for most of his brief life from serious and debilitating illnesses as well as towards the child's biological mother.  Plaintiffs[1] theory is that Defendant Dr. Alice Newton ("Dr. Newton") -- a child abuse pediatrician and the Director of Defendant

---

[1] G.H. (the late, minor child) and J.S.H. (G.H.'s biological mother) (collectively, "Plaintiffs").

1

Massachusetts General Hospital's ("MGH") Child Protection
Program -- harbored longstanding and erroneous suspicions that
J.S.H. was subjecting G.H. to abuse (possibly in the form of
Munchausen syndrome by proxy[2]), and that Dr. Newton repeatedly
acted on these suspicions to Plaintiffs' great detriment.
Further, Plaintiffs argue that MGH was aware of Dr. Newton's
allegedly wrongful conduct and yet fell short of its obligation
to take corrective action and ultimately discriminated against
G.H. in violation of federal law.

Originally, Plaintiffs sued Dr. Newton, MGH (collectively,
"Defendants"), and one or more unnamed MGH employees in a nine-
count Amended Complaint. [ECF No. 18]. However, following U.S.
District Judge Hillman's rulings on Defendants' motions to
dismiss [ECF No. 32] -- as well as Plaintiffs' voluntary
dismissal of certain counts [ECF No. 89 at 1]; [ECF No. 90 at 1]
-- only the following claims remain at the summary judgment
stage:

---

[2] [ECF No. 82-2 (Defendant Dr. Newton explaining that some of her
concerns regarding G.H. included "Munchausen's by proxy,
overmedicalization and pediatric condition falsification")];
N.J. Dep't of Children & Families v. L.O., 460 N.J. Super. 1, 4
n.1, 213 A.3d 187, 189 (Super. Ct. App. Div. 2019) (citing to
medical dictionaries and explaining that, "[w]hat is usually
referred to as 'Munchausen Syndrome by Proxy,' or, more
recently, 'Factitious Disorder Imposed on Another,' is a mental
illness by which a person caring for another, often a child — in
seeking attention — acts as if the cared-for individual has a
physical or mental illness. Its effect on the cared-for
individual results from the obstacles it creates for health care
providers striving to identify the cared-for individual's
nonexistent illness, thereby making the matter worse")
(citations omitted).

| Count # | Plaintiff | Cause of Action | Defendant |
|---------|-----------|-----------------|-----------|
| II | J.S.H., on behalf of G.H. | Violations of Section 504 of the Rehabilitation Act of 1973 ("Section 504")[3] | MGH |
| IV | J.S.H., on behalf of G.H. | Intentional Infliction of Emotional Distress | Dr. Newton |
| V | J.S.H., on behalf of G.H. | Negligent Infliction of Emotional Distress | Dr. Newton |
| VIII | J.S.H., in her individual capacity | Intentional Infliction of Emotional Distress | Dr. Newton |
| IX | J.S.H., in her individual capacity | Negligent Infliction of Emotional Distress | Dr. Newton |

Defendants moved for summary judgment on each of the claims lodged against them. After an in-person hearing [ECF No. 100] and for the reasons stated below, the Court **GRANTED** Dr. Newton's summary judgment motion [ECF No.82] and **GRANTED** MGH's summary judgment motion [ECF No.83] by electronic order. [ECF No. 133]. This Memorandum and Order provides the Court's factual findings and legal analysis for its summary judgment rulings.

## II. Background

### a. The Facts

The following facts are as set forth in the record and are undisputed except as noted.

#### i. Mitochondrial Dysfunction

Mitochondrial Dysfunction ("Mito") is a complex and often

---

[3] See 29 U.S.C. § 794.

genetic medical condition that regularly poses diagnostic challenges due to significant limitations on the ability to objectively confirm the condition as well as the inconsistency of its presentation. [ECF No. 18 at 2-3]. Mito conditions adversely affect the body's mitochondria, and its symptoms are known to include, just for example, "poor growth, muscle weakness/pain, vision or hearing problems, learning disabilities and developmental delays...gastrointestinal disorders, swallowing difficulties, diarrhea or constipation, unexplained vomiting, cramping...increased risk of infection, neurological problems, seizures, migraines, or strokes, [and] thyroid or respiratory problems..." [Id. at 3 n.2].

Before approximately 2017-2018, there was no well-accepted means of diagnosing Mito and the making of such a diagnosis was left to the discretion of highly trained geneticists. [Id. at 3]. Perhaps owing to the profound difficulty in rendering a Mito diagnosis in addition to its vast spectrum of possible symptoms, parents of affected children were often susceptible to allegations of child abuse or neglect. [Id. at 4]. Relatedly, parents of affected children often experience difficult in obtaining adequate medical services, since diagnostic disputes between medical teams can be common. [Id.]

### ii. **J.S.H. and G.H.**

For the bulk of his life, G.H. suffered from a "complex constellation" of symptoms that affected multiple of his body's systems. [Id at 2]. He required mechanical assistance to oxygenate and take nourishment and had poor muscle tone, in

4

addition to a variety of other symptoms. [Id.] Accordingly, he required extensive and persistent medical treatment and specialized services under the direction of his clinical treatment team. [Id.] G.H.'s clinical team suspected that G.H. suffered from Mito, but his symptoms were so complex that there was never a "unifying or confirmed diagnosis" that fully explained his condition. [Id at 5]. G.H. died on or about May 8, 2024. [ECF No. 82-2 at 1 n.2].

J.S.H.'s first child had also suffered from "a Mito disorder" and passed away in 2011 at age four from this condition while being treated at Boston Children's Hospital. [ECF No. 18 at 5]. After her first child passed away, Boston Children's Hospital opened a "internal ethics review study" to determine the propriety of the parents' and the hospital's actions. [Id.] The study concluded that both the parents and the medical team had acted appropriately. [Id.]

Very soon after the passing of J.S.H.'s first child, G.H., then just three years old, began experiencing Mito-like symptoms and began receiving treatment at Boston Children's Hospital. [Id at 6]. It was at this point, in November 2011, that Dr. Newton's appears to have first crossed paths with J.S.H. and G.H. [Id.]

### iii. <u>Dr. Newton's 2011 51A Report & G.H.'s Move to Tufts</u>

In November 2011, Dr. Newton was the Interim Medical Director of the Child Protection Program at Boston Children's Hospital. [ECF No. 82-5 at 3]. In this capacity, and in her future capacities relevant to this case, Dr. Newton was a

"mandated reporter" under Massachusetts law, meaning that she had a statutory obligation to file a "51A report" with the Massachusetts Department of Children and Families ("DCF") if she had "reasonable cause to believe that a child [was] suffering physical or emotional injury resulting from" various kinds of abuse. M.G.L. c. 119, § 51A(a).

Dr. Newton's medical notes from that month reveal that she met with J.S.H. and G.H. upon G.H.'s admission to the hospital. [ECF No. 82-8]. Dr. Newton wrote in part:

> Hospital staff found that mother had been mis-portraying information to her pediatrician, who had prescribed oxygen and ordered multiple blood tests based on mother's misleading reports of other physicians' recommendation...Due to concerns about Medical Child Abuse, a 51A was filed, and DCF opened a case and followed the family for several months. The family remained compliant with not escalating medical care until the case was closed. Family subsequently shifted their medical care to MGH and Tufts from [Boston Children's Hospital] due to the mandated report...

> [Id. at 5].

DCF ultimately found Dr. Newton's November 2011 51A report to be unsubstantiated. [ECF No. 18 at 6]. After the filing of this 51A report, J.S.H. moved G.H.'s treatment from Boston Children's Hospital to Tufts Medical Center ("Tufts"). [Id.] Plaintiffs alleged that between "2011 until August of 2018," Dr. Newton did not have contact with J.S.H. or G.H. [Id at 7]. However, they also allege that, even though Dr. Newton did not work at Tufts (where G.H. was receiving treatment), Dr. Newton filed (an unknown) number of 51A reports regarding G.H. during

this time.  [Id at 6-7].  Further, Plaintiffs allege that these filings led to instances in which G.H. was separated from J.S.H. pending investigations.  [Id at 7].  However, the only instance of separation that has been described with specificity occurred in 2013.  [ECF No. 90-1 at 14].  Regarding these 51A filings, Dr. Newton points out that G.H.'s medical records remained available to her in her capacity at Boston Children's Hospital from "2012 through February 2015" and that the medical notes "demonstrate that much of the diagnoses G.H. had and care he was receiving was based upon report by J.S.H. which were not consistent with or supported by the clinical observations of medical providers and results of objective testing" [ECF No. 82-2 at 4] such that any such 51A filings were legitimate.  The parties dispute this point.  [ECF No. 90-1 at 8].  What is undisputed is that the 51A reports during this period were ultimately found to be unsubstantiated.  [ECF No. 18 at 7].

### iv.  The 2018 MGH Interactions

In 2013, Dr. Newton left Boston Children's Hospital and became the Medical Director of the Child Protection Program at MGH.  [ECF No. 82-5 at 3].  In July of 2018, J.S.H. was identified as a witness in an unrelated state court trial where she would testify about Dr. Newton's propensity for making unfounded allegations of abuse against parents of children with Mito.  [ECF No. 18 at 8].  In August of 2018, G.H. was receiving treatment from a gastroenterologist from Western Massachusetts that practiced at a MGH satellite location.  [Id.]

In Plaintiffs' telling, within two weeks of J.S.H. being

named as a witness in the unrelated state court trial, Dr.
Newton began to access G.H.'s medical chart in the MGH system
and subsequently began to "badger G.H.'s current medical doctors
via text messages, emails, and phone calls over the following
month to see if they would request a consultation with [Dr.
Newton] and the MGH Child Protection Team on the basis of her
'concern' that [J.S.H.] was medically abusing [G.H.]."  [Id at
8-9].

   After G.H.'s MGH medical team allegedly refused such a
consultation, Dr. Newton wrote a letter dated September 7, 2018,
that was sent to G.H.'s MGH medical team as well as the Child
Abuse Pediatrics team at the University of Massachusetts
Hospital that, among other things, relayed her concerns that
J.S.H. was abusing G.H.  [Id. at 9-10].  In her letter, Dr.
Newton asserted that G.H.'s gastroenterologist[4] had contacted her
for a consultation about possible child abuse, which later
became a disputed fact.  [ECF No. 83-2 at 3].

   Dr. Newton also ultimately filed a 51A report regarding
G.H. on September 10, 2018.  [ECF No. 18 at 10-11].  Rejecting
the insinuation that she knew that J.S.H. was named on a witness
list in the state court trial in which she was a defendant, Dr.
Newton filed a sworn affidavit averring that, "[n]either my
counsel, nor anyone else, informed me that J.S.H. was a witness
or potential witness at the [state court trial] prior to
September 6, 2018, when I filed the 51A with respect to G.H."

---

[4] Susan Goode, M.D.

[ECF No. 82-17].  This much is clear: a DCF investigation followed Dr. Newton's 51A report and included home visits with G.H. as well as interviews with J.S.H., Dr. Newton, G.H.'s MGH medical team, and a review of G.H.'s medical record.  [ECF No. 18 at 11].  The report was closed as unsubstantiated.  [Id.]

Plaintiffs have alleged that both Dr. Goode as well as G.H.'s primary care doctor[5] filed internal MGH complaints against Dr. Newton. [Id at 12].  Dr. Kimball-Wren's letter, for example, contained the following: "In my opinion, Dr. Newton is desperately attempting to manipulate a situation that she has no authority to control or be involved in given she last saw the patient in 2011...As his pediatrician, I do not believe his mother caused his illness nor do I believe she is deliberately making him worse..." [ECF No. 83-8 at 4].  Dr. Kimball-Wren also claimed that Dr. Newton's September 7, 2018, letter included several "untruths," including Dr. Newton's assertion that Dr. Goode had contacted her for a consultation about possible child abuse.  [Id.]

In response to Dr. Kimball-Wren's internal complaint, MGH initiated a privileged, "peer review" process that was conducted under the supervision of MGH's Risk Management Division lawyers. [ECF No. 18 at 12].  It is undisputed that at MGH, evaluation of complaints of conduct of professional staff members in their roles as providers of health care "are conducted subject to a peer review process pursuant to the provisions of the applicable

---

[5] Paulette Kimball-Wren, M.D

Quality & Patient Safety Plan and the Bylaws of the Professional Staff." [ECF No. 83-2 at 4 (citing MGH policies and procedures)]. It is also undisputed that MGH did in fact conduct a peer review investigation in the wake of Dr. Kimball-Wren's letter. [ECF No. 92-1 at 4]; [ECF No. 89-7 at 5]. MGH has stated that no disciplinary action was ultimately taken. [ECF No. 83-2 at 4].

Dr. Newton's September 7, 2018, letter has become part of G.H.'s medical record that is viewable to all medical providers across hospitals. [ECF No. 18 at 11]. Plaintiffs assert that medical providers that were unfamiliar with J.S.H. and G.H. would read the letter and that this would sometimes lead to heightened levels of scrutiny, delays in services, and sometimes hostility when they treated G.H. [Id. at 11-12].

**b. Procedural History**

Plaintiffs filed their Amended Complaint on January 6, 2022. [ECF No. 18]. Judge Hillman issued a Memorandum and Order on Defendants' motions to dismiss on February 1, 2023. [ECF NO. 32]. Defendants moved for summary judgment as to each of the remaining claims on June 3, 2024. [ECF No. 82]; [ECF No. 83]. Plaintiffs opposed both motions [ECF No. 89]; [ECF No. 90]. Defendants, in turn, each filed a reply brief [ECF No. 92]; [ECF No. 93]. The Court held an in-person hearing[6] on the

---

[6] The transcript of which can be found at [ECF No. 142].

summary judgment motions [ECF No. 100] and later issued an
electronic order granting both summary judgment motions.  [ECF
No. 133].

III.  **The Court's Jurisdiction and Applicable Substantive Law**

The Court has determined[7] that it has subject matter
jurisdiction under 28 U.S.C. § 1331 (i.e., federal question
jurisdiction) over Plaintiff's Section 504 claim against MGH and
that it has supplemental jurisdiction under 28 U.S.C. §
1367 relative to Plaintiffs' state law claims against Dr.
Newton.  See e.g., T.F. v. Fox Chapel Area Sch. Dist., 589 F.
App'x 594, 596 n.1 (3d Cir. 2014) (unpublished) (explaining
that, "[t]he District Court had federal question jurisdiction
over alleged violations of Section 504 of the Rehabilitation Act
of 1973, 29 U.S.C. § 794(a) pursuant to 28 U.S.C. § 1331. The
District Court had supplemental jurisdiction over the
Pennsylvania state-law claims pursuant to 29 U.S.C. § 1367.").

The Section 504 claim is substantively governed by federal
law.  See e.g., Brittany O v. Texarkana Behavioral Assocs.,
L.C., No. 5:15-CV-5269, 2016 U.S. Dist. LEXIS 109072, at *2
(W.D. Ark. Aug. 16, 2016) (characterizing a Section 504 claim as
a "federal-law claim").  Massachusetts law supplies the

_____

[7] McCulloch v. Velez, 364 F.3d 1, 5 (1st Cir. 2004) ("[i]t is
black-letter law that a federal court has an obligation to
inquire *sua sponte* into its own subject matter jurisdiction")
(citations omitted).

11

substantive rules of decision for Plaintiffs' claims against Dr. Newton. <u>Philibotte v. Nisource Corp. Servs. Co.</u>, 793 F.3d 159, 165 (1st Cir. 2015) ("In 'exercising supplemental jurisdiction over a state law claim,' we apply 'state substantive law' as that law has been applied by the state's highest court") (citation omitted).

## IV.   <u>The Summary Judgment Standard</u>

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." <u>Fed. R. Civ. P. 56(c)</u>. An issue is "genuine" when a reasonable factfinder could resolve it in favor of the nonmoving party. <u>Morris v. Gov't Dev. Bank</u>, 27 F.3d 746, 748 (1st Cir. 1994). A fact is "material" when it may affect the outcome of the suit. <u>Id.</u>

At the summary judgment stage, the Court must view the record in the light most favorable to the non-moving party and must "indulge all reasonable inferences" in their favor. <u>Martins v. Vt. Mut. Ins. Co.</u>, 662 F. Supp. 3d 55, 64 (D. Mass. 2023) (citing <u>O'Connor v. Steeves</u>, 994 F.2d 905, 907 (1st Cir. 1993)). In the first instance, the moving party "bears the burden of demonstrating the absence of a genuine issue of

material fact." Carmona v. Toledo, 215 F.3d 124, 132 (1st Cir. 2000) (citations omitted). If a properly supported summary judgment motion is presented, the adverse party must then "set forth specific facts showing that there is a genuine issue for trial," and may not simply "rest upon mere allegation or denials of [their] pleading," but must instead "present affirmative evidence." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250, 256-57 (1986). "If, after viewing the record in the non-moving party's favor, the Court determines that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law, summary judgment is appropriate." Walsh v. Town of Lakeville, 431 F. Supp. 2d 134, 143 (D. Mass. 2006).

"Neither party may rely on conclusory allegations or unsubstantiated denials, but must identify specific facts derived from the pleadings, depositions, answers to interrogatories, admissions and affidavits to demonstrate either the existence or absence of an issue of fact." Magee v. United States, 121 F.3d 1, 3 (1st Cir. 1997).

Two additional points warrant emphasis in this case. First, when ruling on a summary judgment motion, a district court may only consider *admissible* evidence. Fed. R. Civ. P. 56(c)(2); Degiacomo v. Holland & Knight, LLP (In re Inofin Inc.), 219 F. Supp. 3d 265, 270 (D. Mass. 2016) (explaining that

13

"It is 'black-letter law' that impermissible hearsay cannot be considered for the purpose of summary judgment.") (citations omitted).  Second, although it is true that affidavits may be self-serving and yet still present genuine issues of fact, "if it contains relevant information of which the party has first-hand knowledge", Garmon v. AMTRAK, 844 F.3d 307, 315 (1st Cir. 2016), it is also true that sworn statements that are *filed in conjunction* with oppositions to summary judgment motions may be disregarded if they appear to be merely an attempt to manufacture issues of fact.  See e.g., Escribano-Reyes v. Prof'l Hepa Certificate Corp., 817 F.3d 380, 387 (1st Cir. 2016) (collecting First Circuit cases and finding that "[t]he timing of the sworn statement -- signed one day before Escribano's opposition to [the defendant's] motion for summary judgment was filed -- also supports the district court's conclusion that Escribano's sworn statement was an inappropriate attempt to manufacture issues of fact and should be stricken") (citations omitted); Colantuoni v. Alfred Calcagni & Sons, 44 F.3d 1, 5 (1st Cir. 1994) ("[W]e think it significant that the affidavit was offered only after defendants had filed motions for summary judgment. In these circumstances, we are persuaded that plaintiff's affidavit should be disregarded in considering the propriety of summary judgment....") (citations omitted).

## V.   The Claim Against MGH (Count II)

### a. Legal Landscape

Plaintiffs' sole remaining claim against MGH alleges violations of Section 504.  29 U.S.C. § 794; [ECF No. 18 at 16-17].  Section 504 provides in relevant that:

> No otherwise qualified individual with a disability in the United States...shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance...

29 U.S.C. § 794(a).

To prevail on the Section 504 claim, G.H. must prove four elements to establish a *prima facie* violation of the statute:

> 1) that G.H. was disabled;
> 2) that G.H. services from a federally funded entity;
> 3) that G.H. was "otherwise qualified" to receive those services, and
> 4) that G.H. was denied those services "solely by reason of [his]...disability."

Lesley v. Chie, 250 F.3d 47, 52-53 (1st Cir. 2001) (citing 29 U.S.C. § 794(a)).

As to the first element, "a disability" under Section 504 is "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment[.]" 42 U.S.C. § 12102; 29 U.S.C. § 705(20)(B) (providing that the definition of the term "individual with a

disability" contained in 42 U.S.C. § 12102 shall constitute the
definition of the same term for purposes of Section 504).

   With respect to the second element, the receipt of Medicare
and/or Medicaid payments constitutes "receiving Federal
financial assistance" for purposes of Section 504.  See e.g.,
Glanz v. Vernick, 756 F. Supp. 632, 636 (D. Mass. 1991).
Federal funds do not need to have been received specifically for
the treatment of the complaining plaintiff.  Lesley v. Hee Man
Chie, 81 F. Supp. 2d 217, 222 (D. Mass. 2000) (citation
omitted).

   As to the third element, a person with a disability is
"otherwise qualified" to receive a given service if that person
"meets the essential eligibility requirements for the receipt of
such services." Doe v. Ortho-LA Holdings, LLC, No. 17-8948, 2018
U.S. Dist. LEXIS 165199, at *8 (E.D. La. Sep. 25, 2018) (citing
45 C.F.R. § 84.3(l)(4)).

   As to the fourth element, plaintiffs that challenge a
healthcare provider's refusal to provide treatment must show
that this decision was "devoid of any reasonable medical
support. . .in a way that reveals it to be discriminatory."
Lesley, 250 F.3d at 55.  Section 504 is not meant to apply to
medical treatment decisions.  Lesley, 81 F. Supp. 2d at 224.  As
other courts have explained, the requirement that the alleged
discrimination be motivated solely because of a plaintiff's

16

disability is critical.  *See e.g.*, Johnson v. Thompson, 971 F.2d
1487, 1493 (10th Cir. 1992) ("[t]he word *solely* provides the
key: the discrimination must result from the handicap and from
the handicap alone" (emphasis in original).  Indeed, to make out
*prima facie* case, "a plaintiff must show that he was rejected
under circumstances which gave rise to the inference that his
rejection was based solely on his handicap."  Lesley, 81 F.
Supp. 2d at 223-24 (citing Pushkin v. Regents of the Univ. of
Colorado, 658 F.2d 1372, 1387 (10th Cir. 1981)).  If a plaintiff
establishes a *prima facie* case, "the burden shifts to the
defendant who must show that rejection from the program was for
reasons other than the patient's handicap." Lesley, 81 F. Supp.
2d at 224 (citing Pushkin, 658 F. 2d at 1387).  A plaintiff may
then provide rebuttal evidence "to prove pretext or that the
reason 'encompasses unjustified consideration of the handicap
itself.'"  Lesley, 81 F. Supp. 2d at 224 (citations omitted).

### b. **Application**

Here, the parties do not dispute that the first three
elements are satisfied.  G.H.'s mitochondrial disease was a
disability for purposes of Section 504.  Cf. Kennedy v. Wichita
Cty. Heritage Soc'y, No. 7-06-CV-124-AH, 2008 U.S. Dist. LEXIS
47931, at *2 (N.D. Tex. June 23, 2008) (finding that a minor
that suffered from "mitochondrial myopathy" -- a "medical
condition which involves metabolic, immunity and muscle

impairments" rendered her a qualified individual with a
disability for purposes of the ADA).  Second, it is undisputed
that MGH receives federal funds.  [ECF No. 32 at 17].  Third,
there is no dispute that G.H. was "otherwise qualified" to
receive medical services from MGH.  See [ECF No. 83-2 at 10-12];
[ECF No. 92 at 1-3 (MGH only contesting the fourth element).

MGH's principal argument is that there is no triable issue
of fact that G.H. ever elected to receive certain treatment at
MGH and was denied that treatment, and that, even if there was a
denial, there is no triable issue as to whether that decision
was made solely because of his disability.  [ECF No. 83-2 at
10].  Instead, MGH contends, any decisions that were made
regarding G.H. seeking treatment elsewhere were voluntary family
decisions.  Id.

Plaintiffs respond that MGH's articulation of the
applicable legal standard from Lesley[8] constituted an "overly
restrictive lens" and that discrimination under Section 504
includes far more than just denial of services, citing to a
section of the Code of Federal Regulations in support of this
argument.  [ECF No. 89 at 1-2].  The Court rejects this apparent
attempt to amend the legal standard for this type of Section 504
claim as set forth by the First Circuit in Lesley. 250 F. 3d at
52-53 (citation omitted).  Especially since Judge Hillman made
clear at the motion to dismiss stage [ECF No. 32 at 15] that the
Lesley elements applied to G.H.'s Section 504 claim, the Court

---

[8] 250 F.3d at 52-53.

will not now entertain arguments that a different legal standard
should somehow apply.

The first question, then, is whether G.H. has produced
sufficient facts to create a triable issue as to the alleged
denial of services.  If so, the second inquiry would be whether
any such denial decisions were made solely because of G.H.'s
disability.  See Lesley, 250 F. 3d at 52-53 (citation omitted).

Plaintiffs' opposition *to MGH's* summary judgment motion
begins with a lengthy rehash of their allegations *against Dr.
Newton* [ECF No. 89 at 3-5] before eventually turning to the
first relevant inquiry.  [Id at 5-7].  On that score, G.H. began
by calling the Court's attention to the following exchange that
occurred during the deposition of Dr. Kimball-Wren -- the
"essential leader" of G.H.'s MGH's treatment team:

> Q. Okay. So, as the leader of [G.H.'s] team, are you
> aware of anyone who treated [G.H.] differently because
> of Dr. Newton's note?
>
> A. I do believe it created, from what I understand,
> some contention between different providers and
> caregivers such as nursing staff in the ICU.
>
> [ECF No. 89-7 at 6].

First, even indulging all reasonable inferences in G.H.'s
favor, "contention"[9] *among certain medical providers* does not

---

[9] Merriam-Webster's online dictionary defines "contention"" as "a
point advanced or maintained in a debate or argument" or,
alternatively, "an act or instance of contending."  *Contention*,
MERRIAM-WEBSTER.COM, https://www.merriam-
webster.com/dictionary/contention (last visited December 30,
2024).

create a triable issue as to whether MGH denied G.H. denied any medical services.  Moreover, the exchanges that immediately follow the portions highlighted by G.H. make clear that Dr. Kimball-Wren did not believe that any member of G.H.'s physician treatment team treated G.H. favorably or unfavorably because of Dr. Newton's note.  [Id. (Dr. Kimball-Wren testifying that "I don't believe anyone that was actually a specialist taking care of [G.H.] for example, like Dr. Ted Kremer, treated him favorably or unfavorably. I think anyone involved on a regular basis with his care continued to take care of him as issues came up").  Accordingly, the Court finds that Dr. Kimball-Wren's deposition testimony did not create a triable issue of fact as to whether MGH denied G.H. any medical services.

G.H. next directed the Court to certain portions of G.H.'s father's[10] deposition testimony.  [ECF No. 89 at 5-6].  Although G.H.'s father seems to earnestly believe that *Dr. Newton's* alleged actions significantly impacted G.H.'s medical care in a variety of ways, careful examination of his deposition testimony reveals that it is devoid of sufficient admissible evidence to create a triable issue of fact as to whether *MGH* ever denied G.H. any medical services.  See [ECF No. 90-8 at 2-7].

Three representative examples from G.H.'s father's

---

[10] G.H. redacted his father's name from the deposition transcript excerpt that it attached to its opposition brief.  [ECF No. 90-8].

deposition transcript support this conclusion.  First, G.H.'s father made a general claim that the introduction of Dr. Newton's 2018 letter to G.H.'s medical file has "caused a significant amount of trouble with his medical care."  [Id at 3].  While the Court has no reason to doubt the veracity of this claim, it falls well short of the type of evidence that G.H. may rely upon to create a triable issue of fact.  See e.g., Magee, 121 F.3d at 3 (explaining that "[n]either party may rely on conclusory allegations or unsubstantiated denials, but must identify specific facts derived from the pleadings, depositions, answers to interrogatories, admissions and affidavits to demonstrate either the existence or absence of an issue of fact.").  In fact, the closest that G.H.'s father's deposition testimony comes to sufficiently describing a specific occurrence that might arguably be considered a denial of medical services involved a doctor that apparently was affiliated with *non-party* University of Massachusetts Memorial Medical Center — not MGH. See [ECF No. 90-8 at 5].

Finally, G.H. calls the Court's attention to an exchange in which G.H.'s father recounted the family decision -- made sometime in 2018 -- that G.H. would no longer receive treatment from a Doctor Young, whose practice had recently been "bought" by MGH.  [Id at 5-6].  However, not only does this exchange not contain any admissible evidence suggesting that MGH denied G.H.

the right to receive treatment from Doctor Young, G.H.'s father acknowledged that he never had any direct conversations with Doctor Young about the family's voluntary decision to terminate her treatment of G.H. [Id. at 6]. In sum, the Court has identified no admissible evidence within G.H.'s father deposition transcript that creates a triable issue of fact of whether MGH ever denied G.H. any medical services.

The final repository of evidence to which G.H. directs the Court is the deposition testimony of Ms. Sarah Rothenberger, the DCF employee that investigated Dr. Newton's 2018 51A filing. [ECF No. 89 at 6-7]. However, to the extent that Ms. Rothenberger's testimony bears on the inquiry at hand, it strongly signals that G.H.'s treatment team at MGH *was resolute in continuing to provide* medical services to G.H. Indeed, nothing in the Rothenberger deposition suggests that MGH ever denied any medical services to G.H. The following two exchanges highlight this point:

> Q. Did any of the doctors that you spoke with corroborate or share the concern that case was being medically mismanaged?
>
> A. No.
>
> Q. Did any of the treating doctors that you spoke with corroborate or share the belief that [G.H.] would benefit from being separated from his parents and weened off of his medications and his treatments?
>
> A. No.

[ECF No. 90-13 at 3].

After careful review of the documentary record, the Court directly inquired of G.H.'s counsel during oral argument as to whether MGH had ever denied medical services at the summary judgment hearing.  [ECF No. 142 at 14-15].  G.H.'s counsel acknowledged that G.H.'s family decided to withdraw him from treatment at MGH and that MGH had never denied him medical services or told the family that they would deny him medical services.  [Id.]

In sum, the Court finds that G.H. has not produced evidence from which a reasonable jury could conclude that MGH ever denied G.H. any medical services.  Therefore, G.H. has failed to satisfy the fourth element of the Lesley[11] standard and has thus failed to establish a *prima facie* Section 504 claim.

### c. **Count II – Conclusion**

For all of these reasons, MGH's motion for summary judgment as to Count II is **GRANTED**.

### d. **Implications**

The Court's ruling above has several implications.  First, since the Court has decided that there is not a triable issue as to whether MGH ever denied G.H. any medical treatment, it need not and will not reach the second inquiry under the fourth

---

[11] 250 F.3d at 52-53.

element, which would have examined whether any such denials were done solely on the basis on G.H.'s disability.  Second, since the Court has concluded that there is insufficient evidence of an underlying Section 504 claim of intentional discrimination, the Court need not and will not reach the issue of whether MGH could be held liable under a theory of vicarious liability.  See e.g., Shaffer v. City of Columbus, 444 F. Supp. 3d 872, 879 (S.D. Ohio 2020) ("because the Court ultimately concludes that Ms. Shaffer has not offered sufficient evidence to prove intentional discrimination, the Court need not and will not decide whether vicarious liability is a viable theory of liability under Title II or Section 504.")

## VI.  The Claims Against Dr. Newton (Counts IV, V, VII, and IX)

The Court turns next to Plaintiffs' four Massachusetts state law claims against Dr. Newton, which fall into two buckets: the negligent infliction of emotional distress ("NIED") claims (Count V and Count IX) and the intentional infliction of emotional distress ("IIED") claims (Count IV and Count VIII).

### a. The NIED Claims (Counts V and IX)

#### i. Ordinary Negligence or Medical Negligence?

A threshold question that the Court must resolve before it reaches the merits of the NIED claims is whether Plaintiffs' case against Dr. Newton is one of *medical* negligence or of *ordinary* negligence.  The answer to this question matters because it has some bearing on the degree to which expert

testimony might be necessary.

Dr. Newton argues in the first instance that this is a case of medical negligence. [ECF No. 82-1 at 12]. Plaintiffs insist that theirs is a case of ordinary negligence. [ECF No. 90 at 2]. To resolve this question, the Court must determine the appropriate legal test for raising an issue of medical negligence under Massachusetts law and apply it to the facts of this case.

As the First Circuit has explained, to show medical negligence under Massachusetts law, the 'plaintiff must show (1) the existence of a doctor or nurse-patient relationship, (2) that the performance of the doctor or nurse did not conform to good medical practice, and (3) that damage resulted therefrom.'" Bradley v. Sugarbaker, 809 F.3d 8, 16 (1st Cir. 2015) (citing St. Germain v. Pfeifer, 418 Mass. 511, 637 N.E.2d 848, 851 (Mass. 1994)).

Here, it is undisputed that Dr. Newton did *not* have a doctor / patient relationship with G.H. during the relevant period. [ECF No. 90-9 at 2 (Dr. Newton acknowledging at a deposition that she did not have a doctor / patient relationship with G.H. in August and September of 2018)]; [ECF No. 90 at 2]. Although Dr. Newton maintains that she enjoyed a "consultant" relationship with G.H., the undisputed fact that there was not a doctor / patient relationship ends the legal inquiry -- since application of the first prong of the legal test outlined above means that this is *not* a case of medical negligence. It is thus a case of ordinary negligence. Cf. Baynard v. Derma Clinic,

Inc., No. CV044000265S, 2005 Conn. Super. LEXIS 2394, at *6
(Super. Ct. Sep. 1, 2005) ("it appears that the negligence
alleged is ordinary negligence, not medical malpractice.  There
was no doctor/patient relationship between Dr. O'Connell and the
plaintiff, nor would it be possible to prove such a
relationship, a necessity in a medical negligence case.").

However, as explained below, it does not follow -- as
Plaintiffs contend[12] -- that just because theirs are claims of
ordinary negligence that the introduction of expert testimony is
rendered automatically unnecessary -- in fact, the issue of
whether expert testimony is required is decided in cases such as
these is to be decided on a case-by-case basis.  Cf. Dyer v.
Steward Carney Hosp., Inc., No. 17-cv-11452-DJC, 2021 U.S. Dist.
LEXIS 191779, at *6 (D. Mass. Oct. 5, 2021) (considering a
defendant's summary judgment motion targeting an IIED claim
arising under Massachusetts law and explaining that there is "no
'bright-line rule that expert testimony is always necessary to
prove the causation prong of [intentional infliction of
emotional distress].'" (citation omitted; brackets in original);
Sullivan v. Bos. Gas Co., 414 Mass. 129, 138 (1993) (explaining
that, in the context of NIED claims, "[e]xpert medical testimony
*may* be needed" for plaintiffs to make their required showing of
physical harm) (emphasis added).

---

[12] See e.g., [ECF No. 90 at 2 (Plaintiffs' contending that,
"medical expert testimony that Newton was negligence in her
medical care and treatment of G.H. has no place in this
litigation, as she was not his medical provider, and she
provided no medical care or treatment to him.")].

**b. <u>Legal Landscape</u>**

In order to recover for NIED under Massachusetts law, a plaintiff must prove: "(1) negligence; (2) emotional distress; (3) causation; (4) physical harm manifested by objective symptomatology; and (5) that a reasonable person would have suffered emotional distress under the circumstances of the case." <u>Payton v. Abbott Labs.</u>, 386 Mass. 540, 557 (1982).

The Supreme Judicial Court ("SJC") has explained that "[a] successful negligent infliction of emotional distress claim...must do more than allege 'mere upset, dismay, humiliation, grief and anger.'" <u>Bresnahan v. McAuliffe</u>, 47 Mass. App. Ct. 278, 284, 712 N.E.2d 1173 (1999) (citation omitted). With respect to the emotional distress element, plaintiffs seeking to survive summary judgment must be specific and detailed in their descriptions.  See e.g., <u>Lechoslaw v. Bank of Am., N.A.</u>, 575 F. Supp. 2d 286, 298 (D. Mass. 2008) (granting summary judgment on a NIED claim where "Plaintiff here has offered *no* objective evidence of harm, and indeed has offered only vague descriptions of his symptoms...") (emphasis in original); <u>Papasodero v. Thayer & Assocs.</u>, 14 Mass. L. Rep. 684 (2002) (J. Fecteau) (granting summary judgment on a NIED claim where although the plaintiffs "attest[ed] that they were greatly injured in their feelings and that they suffered great, extreme and severe distress of mind" they however "fail[ed] to cite to a particular date or time they experienced these symptoms.").

With respect to the physical harm prong, the SJC has recognized that this element is a critical requirement.

<u>Sullivan</u>, 414 Mass. at 132-133 (stating the three reasons that the Court added the physical harm requirement).  The <u>Sullivan</u> Court held that although expert medical evidence was not a requirement to satisfy the physical harm prong, a plaintiff attempting to survive summary judgment in this context still "must *corroborate* [their] mental distress claims with *enough objective evidence* of harm to convince a judge that [their] claims present a sufficient likelihood of genuineness to go to trial." <u>Sullivan</u>, 414 Mass. at 137-138 (emphasis added).

Indeed, as another session of this Court has explained, "although Massachusetts courts have broadened the definition of physical harm, they have not eliminated the requirement, but instead have merely 'expanded the range of symptoms that may provide the type of objective evidence to prove physical harm to include symptoms that could be classified as more 'mental' than 'physical.'"  <u>Roe v. Lincoln-Sudbury Reg'l Sch. Dist</u>., Civil Action No. 18-10792-FDS, 2021 U.S. Dist. LEXIS 57206, at *114 (D. Mass. Mar. 24, 2021) (citation omitted).  Although it is true that there is no "specific type or quantity of evidence" that is required for a NIED claim to survive summary judgment, <u>Lechoslaw</u>, 575 F. Supp. 2d at 298 n.21 (citation omitted), the key is that a plaintiff must still find a way to "*corroborate*" their mental distress claims with enough "objective evidence" to create a trial issue of fact.  <u>Sullivan</u>, 414 Mass. at 137-138.

c. <u>**NIED Claims – Application**</u>

Here, drawing all reasonable inferences in Plaintiffs'

favor, J.S.H.'s and G.H.'s NIED claims each fail for principally the same two reasons: (1) neither Plaintiff has introduced sufficient evidence regarding the specifics and the severity of their alleged emotional distress, and (2) neither Plaintiff has introduced sufficient "objective evidence" to "corroborate" their alleged physical harm.  Thus, even assuming without deciding that the other elements of this tort were met in each of Plaintiffs' NIED claims, these failures require summary judgment entering in favor of Dr. Newton on both Count V and Count IX.

### i.  **The Alleged Emotional Distress – J.S.H.**

The Court's review of the summary judgment record reveals that throughout the course of this litigation, J.S.H. repeatedly failed to sufficiently flesh out the nature and substance of her alleged emotional distress.  Dr. Newton's First Set of Interrogatories sent to J.S.H. contained among other things the following request:

> Interrogatory No. 4: "With respect to the allegations of negligent infliction of emotional distress set forth in the First Amended First Amended Complaint, please set forth all facts known to you, your agents, servants or attorneys, on the basis of which you have made these allegations."

> [ECF No. 82-11 at 3-4].

In response to this request, J.S.H. offered only a boilerplate objection and then referred Dr. Newton to "the 26-

page Amended Complaint," which, she claimed, "set[] forth the Plaintiff's claims in detail, along with the DCF documents and other records previously produced throughout the course of discovery." [Id.] Although the relevant allegations contained in the Amended Complaint were certainly sufficiently to survive a motion to dismiss, this Court finds that they are insufficiently specific for purposes of summary judgment. See [ECF No. 18 at 24-25 (J.S.H. alleging that:

> [a]s a direct, proximate and foreseeable result of Defendant Dr. Newton's extreme and outrageous conduct against J.S.H., she has suffered and continues to suffer general damages including but not limited to significant and enduring ***emotional distress including humiliation, mental anguish and physical distress, injury to mind and body***, in a sum to be proven at trial, in excess of the minimum jurisdictional requirements of this Court") (emphasis added)].

Indeed, merely citing back to "mere allegation[s]" in one's pleadings is not enough to survive summary judgment. See Anderson, 477 U.S. at 256-57 (explaining that at the summary judgment stage, the adverse party may not simply "rest upon mere allegation or denials of [their] pleading," but must instead "present affirmative evidence").

Another one of J.S.H.'s responses to Dr. Newton's First Set of Interrogatories further highlights the insufficiency of J.S.H.'s evidence regarding her alleged emotional distress. Interrogatory Number 9 asked J.S.H. the following:

Please describe the nature and extent of the medical
or mental health treatment which you claim to have
received as a result of the occurrences set forth in
your First Amended Complaint, stating in each case the
date thereof and the names and addresses of physicians
and hospitals involved.

[ECF No. 82-11 at 3-4].

After lodging an objection to this request, J.S.H. then stated, "[t]o the extent I seek emotional distress damages *beyond the rubric of garden variety emotional distress*, I will seasonably supplement this response with further responsive information, if any." [ECF No. 82-11].  Since J.S.H. never supplemented her Interrogatory responses [ECF No. 93 at 2], the Court is left to wonder whether her acknowledgment that she was only seeking "garden variety" emotional distress necessarily means that J.S.H. abandoned her NIED claims, since there is an abundance of legal authority suggesting that "garden variety" emotional distress claims are entirely distinct from claims such as IIED and/or NIED.  See e.g., Belvin v. Electchester Mgmt., LLC, 635 F. Supp. 3d 190, 198 n.2 (E.D.N.Y. 2022) (explaining that "[c]laims of emotional distress that are 'garden variety' are simple or usual, as contrasted with claims (such as intentional or negligent infliction of emotional distress) that a defendant's actions result[ed] in a specific psychiatric disorder.") (internal quotation marks and citations omitted).

This Court will not apply the harsh penalty of finding that

J.S.H. abandoned her NIED claim, but it certainly finds that her description of her emotional distress as being of a "garden variety" falls far short of the required level of detail necessary at the summary judgment stage.  See e.g., Papasodero, 14 Mass. L. Rep. 684, *20-21 (2002) (granting summary judgment on an NIED claim where the plaintiffs' "attest[ed] that they were greatly injured in their feelings and that they suffered great, extreme and severe distress of mind" but "fail[ed] to cite to a particular date or time they experienced these symptoms.").

In her opposition, J.S.H. claims, among other things, that because of Dr. Newton's alleged conduct, "she experienced significant emotional distress..."  [ECF No. 90 at 8-9].  She further asserts that in 2018 she was "diagnosed with anxiety and PTSD by a licensed clinical social worker and would also frequently experience episodes akin to panic attacks when interacting with her son's medical providers relative to medical decisions for G.H. out of fear that something like a fraudulent 51A filing would happen again, as it did with Dr. Newton." [Id.]

Although such medical conditions might, under some circumstances, satisfy the emotional distress element of an NIED claim at the summary judgment stage, the Court finds that these assertions are both untimely and unsubstantiated by objective evidence.  They are untimely since they were contained in an

affidavit from J.S.H. that was *filed in conjunction with and on the same day* as her opposition to Dr. Newton's summary judgment motion.  Although the Court has no reason to doubt the veracity of J.S.H.'s assertions[13], it will disregard the J.S.H. affidavit because it is untimely, especially given the fact that Dr. Newton had explicitly asked for this sort of testimony in the interrogatories cited above.  See e.g., United States v. McNicol, 829 F.3d 77, 83 (1st Cir. 2016) ("A party is ordinarily bound by her unambiguous and unamended answers to interrogatories.").

Adverse parties should not be allowed to ambush parties moving for summary judgment with eleventh-hour affidavits, filed in conjunction with their oppositions, that are finely tuned to create material issues of fact, and the Court will not allow J.S.H. to do so here.  See e.g.,  Orta-Castro v. Merck, Sharp & Dohme Quimica P.R., Inc., 447 F.3d 105, 110 (1st Cir. 2006) (agreeing with the district court's decision to disregard a statement that was "executed only after Merck had filed its motion for summary judgment, thus suggesting that the Statement was made solely to create an issue of fact for the purpose of surviving summary judgment."); Colantuoni v. Alfred Calcagni & Sons, 44 F.3d 1, 5 (1st Cir. 1994) ("we think it significant

---

[13] Moreover, the Court recognizes the principle that self-serving affidavits may under circumstances create genuine issues of material fact.  See e.g., Garmon v. AMTRAK, 844 F.3d at 315.

that the affidavit was offered only after defendants had filed motions for summary judgment. In these circumstances, we are persuaded that plaintiff's affidavit should be disregarded in considering the propriety of summary judgment...") (citations omitted).

In addition to finding the affidavit untimely, the Court also notes that it was presented in the absence of any expert medical testimony. Although the Court recognizes that such testimony is not required for J.S.H. to satisfy the emotional distress requirement, Lechoslaw, 575 F. Supp. 2d at 298 n.21, the Court finds that J.S.H.'s untimely -- and thus unchallenged assertions -- are insufficient to satisfy the emotional distress prong, especially since they were not corroborated with any objective evidence. See e.g., Godette v. Stanley, 490 F. Supp. 2d 72, 81-83 (D. Mass. 2007) (granting summary judgment on an NIED claim where, among other things, "Plaintiff has submitted no affidavits from physicians or counselors who attest to the severity of his mental distress..."). Accordingly, the Court finds that J.S.H. has not created a triable issue of fact with respect to the emotional distress requirement.

### ii.  **The Alleged Physical Harm – J.S.H.**

The Court's review of the summary judgment record also reveals that throughout the course of this litigation, J.S.H.

failed to "*corroborate* [her] mental distress claims with enough *objective evidence of harm* to convince a judge that [their] claims present a sufficient likelihood of genuineness to go to trial." Sullivan, 605 N.E.2d. at 810 (emphasis added).

In her summary judgment briefing, J.S.H. made several assertions regarding alleged physical harm. [ECF No. 90 at 8-9]. For instance, J.S.H. claimed that, in addition to experiencing alleged emotional distress, she sustained "accompanying physical symptoms, including but not limited to anxiety, PTSD, headaches, fatigue, nightmares, sleeplessness, and panic attacks, which occurred on a weekly basis and which she ultimately sought counseling for." [Id. at 8]. J.S.H.'s only citation for this proposition was her untimely affidavit, referenced *supra*. [ECF No. 90-15 at 1]. As noted above, J.S.H. also claimed that, following Dr. Newton's 51A filing in 2018, she was:

> "diagnosed with anxiety and PTSD by a licensed clinical social worker and would also frequently experience episodes akin to panic attacks when interacting with her son's medical providers relative to medical decisions for G.H. out of fear that something like a fraudulent 51A filing would happen again, as it did with Dr. Newton."

[ECF No. 90 at 8].

As with her claim above, J.S.H.'s only citation for this statement was an untimely affidavit. [ECF No. 90-15 at 1]. Lastly, J.S.H. asserted in her summary judgment papers that,

"[d]uring these episodes, [she] would experience hot flashes, mental fogginess, elevated heart rate, and a fight-or-flight response that caused her to either freeze or become agitated and angry" and that "[t]hese symptoms resulted in trouble making necessary medical decisions." [ECF No. 90 at 8-9].  The only cited support for these contentions were her untimely affidavit. [ECF No. 90-15 at 1].

A close read of the summary judgment record reveals that Dr. Newton inquired multiple times about the factual underpinnings of J.S.H.'s NIED claim -- which of course would have included facts bearing on the physical harm element -- but J.S.H. did little more than reply on the factual allegations contained in the Amended Complaint.  For example, Question 5 in Dr. Newton's First Set of Interrogatories asked J.S.H. to, "set forth all facts known to you, your agents, servants or attorneys, on the basis of which you have made [her NIED] allegations."  [ECF No. 82-10 at 3].  In response, J.S.H. countered with a boilerplate objection and then wrote, "[t]he Plaintiff refers the Defendant to the 26-page Amended Complaint, which sets forth the Plaintiff's claims in detail, along with the DCF documents and other records previously produced throughout the course of discovery."  [Id. at 4].

As discussed *supra*, merely directing a defendant back to the complaint is an insufficient way of proving the existence of

a triable issue of fact.  See Anderson, 477 U.S. at 256-57
(explaining that at the summary judgment stage, the adverse
party may not simply "rest upon mere allegation or denials of
[their] pleading," but must instead "present affirmative
evidence").

Further, it is undisputed that J.S.H. did not proffer any
expert testimony regarding her alleged physical harm.  As
another session of this Court has noted, "[t]he absence of
corroborating medical evidence leaves a plaintiff's cause of
action vulnerable to disposition by summary judgment."  Ball v.
Wal-Mart Inc., 102 F. Supp. 2d 44, 52 (D. Mass. 2000).  In fact,
the case law teaches that even providing *some expert medical
testimony* is not always enough to defeat summary judgment.  See
e.g., Id. (citing Flanagan v. Baker, 35 Mass. App. Ct. 444, 450
(1993) and Odell v. Wilder, 1995 Mass. Super. LEXIS 519 (Mass.
Super.) as instances where plaintiffs that provided less-than-
comprehensive medical expert testimony had summary judgment
enter against their NIED claims).

Here, J.S.H. provided *nothing more* to support her claim of
physical harm than one single affidavit -- which she herself
authored. [ECF No. 90 at 8-9].  By definition, then, it is
nearly impossible to see how she could fairly be said to have
"*corroborated*" her mental distress claims with sufficient
"*objective* evidence of harm."  See Sullivan, 414 Mass. at 137-

138.

Indeed, on this score, the summary judgment record in this case is similar to that which was before the Court in Lechoslaw. 575 F. Supp. 2d 286, 298 (D. Mass. 2008).  There, another session of this Court found that with respect to the physical harm requirement, "[p]laintiff has provided no medical records, physician affidavits, or other corroborating evidence" and had relied only on his own statements.  Id.  The Court reasoned that since "[p]laintiff here has offered *no* objective evidence of harm, and indeed has offered only vague descriptions of his symptoms... The lack of even a single supporting piece of medical evidence in the record mandates summary judgment for defendants."  Id. (emphasis in original).

The same is true here, except that the record in this case is even more problematic for the J.S.H., since her uncorroborated statements were untimely.  Even when "indulg[ing] all reasonable inferences" in J.S.H.'s favor, Martins, 662 F. Supp. At 64, the Court finds that J.S.H. has not provided sufficient evidence to create a triable issue of whether she experienced physical harm for purposes of her NIED claim.

d. **Count IX – Conclusion**

For all of these reasons, Dr. Newton's motion for summary judgment as to Count IX is **GRANTED**.

i.  **The Alleged Emotional Distress – G.H.**

In their Amended Complaint, Plaintiffs alleged in relevant part that "G.H. has suffered and continues to suffer general damages including but not limited to significant and enduring emotional distress including humiliation, mental anguish and physical distress, injury to mind and body..." [ECF No. 18 at 20]. In their summary judgment papers, Plaintiffs directed the Court to the following alleged facts regarding G.H.'s purported emotional distress:

> In this case, GH's medical records indicate that when he was hospitalized and separated from his parents as a result of Newton's 51A filing, he *experienced stress due to the separation*, which is a common response in children separated from their parents under such circumstances...
>
> [ECF No. 90 at 8-9 (emphasis added)].

With respect to the assertion that Dr. Newton caused G.H. to suffer emotional distress when G.H. was "separated" from his parents, it is undisputed that the only alleged separation of G.H. from his parents that was arguably attributable to Dr. Newton occurred in 2013 when G.H. was a patient at Tufts Medical Center. [ECF No. 18 at 7]. So, even assuming without deciding that this alleged instance of emotional distress would satisfy this element of the tort, it is time-barred. See e.g., Lanier v. President & Fellows of Harvard Coll., 490 Mass. 37, 46 (2022) (explaining that "[a]s a tort action, a claim for negligent infliction of emotional distress must be brought 'within three

39

years next after the cause of action accrues') (citing M.G.L. ch. 260, § 2A).

Further, Plaintiffs did not produce any expert medical testimony bearing on the issue of whether G.H. suffered any alleged emotional distress.  Indeed, as Dr. Newton points out, Plaintiffs did not even direct the Court to any specific portion of G.H.'s extensive medical record that might indicate any emotional distress caused by Dr. Newton.  [ECF No. 93 at 3].

Accordingly, the Court finds that G.H. has not created a triable issue of fact with respect to the emotional distress requirement.

ii.  **The Alleged Physical Harm – G.H.**

In their summary judgment briefing, Plaintiff's only reference to the alleged physical harm that G.H. sustained because of Dr. Newton's alleged conduct is contained in the same sentence cited *supra*.  Namely, Plaintiffs claim that:

> In this case, GH's medical records indicate that when he was hospitalized and separated from his parents as a result of Newton's 51A filing, he *experienced stress due to the separation*, which is a common response in children separated from their parents under such circumstances *and that his physical condition did not get better, but rather worsened.*

> [ECF No. 90 at 8-9 (emphasis added)].

Again, even assuming that Dr. Newton wrongfully caused the alleged separation and even assuming that some physical harm resulted, it is undisputed that this event occurred in 2013, and

therefore the Court finds it time-barred.  See Lanier v.
President & Fellows of Harvard Coll., 490 Mass. 37, 46 (2022).
More fundamentally, Plaintiffs have failed to "*corroborate*
[G.H.'s] mental distress claims with *enough objective evidence*
of harm" to convince this Court that they have a "sufficient
likelihood of genuineness to go to trial." See Sullivan, 414
Mass. at 137-138 (emphasis added).  The Court has before it no
medical or other objective evidence that it can use to
corroborate G.H.'s claims.  Accordingly, the Court finds that
G.H. has not created a triable issue of fact with respect to the
physical harm requirement.

### e. Count V – Conclusion

For all of these reasons, Dr. Newton's motion for summary
judgment as to Count V is **GRANTED**.

### f. The IIED Claims (Counts IV and VIII)

#### i. Legal Landscape

To state a IIED claim under Massachusetts law, a complaint
must allege: (1) that the defendant intended to inflict
emotional distress or that they knew or should have known that
emotional distress was the likely result of their conduct; (2)
that the conduct was extreme and outrageous and beyond all
possible bounds of decency, and was utterly intolerable in a
civilized community; (3) that the actions of the defendant were
the cause of the plaintiff's distress; and (4) that the

emotional distress sustained by the plaintiff was severe and of a nature that no reasonable person could be expected to endure it. Agis v. Howard Johnson Co., 371 Mass. 140, 144-45, 355 N.E.2d 315 (1976) (internal quotation marks and citations omitted).

Courts apply a "very high" standard to claims of intentional infliction of emotional distress, especially as to the nature of the conduct. See Doyle v. Hasbro, Inc., 103 F.3d 186, 195 (1st Cir. 1996). "[L]iability cannot be predicated upon 'mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities.'" Foley v. Polaroid Corp., 400 Mass. 82, 99, 508 N.E.2d 72 (1987) (citation omitted). Further, IIED claims require "a high order of reckless ruthlessness or deliberate malevolence that . . . is simply intolerable." McCormick v. Lischynsky, 539 F. Supp. 3d 225, 244 (D. Mass. 2021) (citation omitted).

### ii. **IIED Claims – Application**

Dr. Newton has moved for summary judgment on the grounds that (a) neither J.S.H. nor G.H. have created a triable issue of fact as to whether her conduct was extreme and outrageous, and because (b) both J.S.H.'s and G.H. claims of emotional distress are unsubstantiated. [ECF No. 82-1 at 15]. Drawing all reasonable inference in Plaintiffs' favor, the Court finds that (1) the facts here do not rise to the level of extreme and outrageous conduct, and that (2) neither J.S.H. nor G.H. have

created a triable issue of fact as to whether their alleged
emotional distress was severe and of a nature that no reasonable
person could be expected to endure it.  Thus, even assuming
without deciding that the other elements of this tort were met
in each of Plaintiffs' IIED claims, these two deficiencies
mandate summary judgment entering in favor of Dr. Newton on both
Count IV and Count VIII.

### A. The Allegedly Extreme & Outrageous Conduct[14]

In their summary judgment briefing, J.S.H. and G.H. argue
that the issue of whether Dr. Newton's conduct was extreme and
outrageous is a jury question.  [ECF No. 90 at 9].  However,
there is no absolute rule requiring all IIED claims to be
submitted to a jury; indeed, other sessions of this Court
regularly enter summary judgment against such claims when it is
clear from the evidence submitted at the summary judgment stage
that no reasonable jury could find the alleged conduct extreme
and outrageous.  See e.g., Doe v. Town of N. Andover, Civil
Action No. 1:20-cv-10310-IT, 2023 U.S. Dist. LEXIS 85243, at *44
(D. Mass. May 16, 2023) ("The court finds that the evidence
submitted is insufficient for a jury to find that the Individual
Defendants' actions rise to the level of severe and outrageous

---

[14] Since J.S.H. and G.H. both complain of the same allegedly
extreme and outrageous conduct, the Court will not bifurcate
this section of its analysis.

conduct required for an intentional tort claim."); McCormick v. Lischynsky, 539 F. Supp. 3d 225, 244 (D. Mass. 2021)("[a] reasonable jury could not find that Lischynsky engaged in any intentional acts sufficiently extreme and outrageous to meet the high standard for IIED claims").

With respect to the merits of whether Dr. Newton's alleged conduct was extreme and outrageous, J.S.H. and G.H. focus heavily on Dr. Newton's allegedly unfair pattern of lodging accusations about and against them.  See e.g., [ECF No. 90 at 10 ("the evidence demonstrates that Dr. Newton deliberately went out of her way to target [G.H.] based on his disabilities as a medically complex child and used his medical complexities to intentionally foster a false narrative to both DCF and his treating providers that [J.S.H.] was medically abusing him...")].  Plaintiffs point to the alleged fact that Dr. Newton continued to raise concerns about G.H. even over the objections of her colleagues.  See [id at 10-11 ("[w]hen Dr. Kimball-Wren and Dr. Goode objected to the allegations in Newton's medical note – both via letter and via complaints to MGH regarding Newton – Newton still proceeded to file a 51A against [J.S.H]...")].

Although Plaintiffs paint an unfavorable picture of Dr. Newton's alleged actions, they have overlooked both the legal standard that controls as well as the unique position that Dr.

Newton occupies.  No reasonable jury could conclude that Dr.
Newton's alleged actions, even if painful for Plaintiffs to
experience, were marked by "a high order of *reckless*
*ruthlessness* or *deliberate malevolence that . . . is simply*
*intolerable*", especially given that, at all relevant times, Dr.
Newton's express job responsibilities required her to, among
other things, consult with clinicians anytime she had concerns
for child abuse and/or neglect *as well as* serving as a mandated
reporter.  See [ECF No. 82-1]; McCormick, 539 F. Supp. 3d at 244
(emphasis added).

On this latter point, the Court finds a recent summary
judgment decision from the Superior Court of Connecticut
particularly persuasive.  Abubakari v. Schenker, No. CV-22-
6123280-S, 2024 Conn. Super. LEXIS 1581, at *18-20 (Super. Ct.
Aug. 2, 2024).  In Abubakari, plaintiff-parents alleged that
defendant-school social worker had, among other things,

> knowingly and maliciously filed a false complaint with
> the Connecticut Department of Children and Families
> (DCF) claiming that the plaintiffs were educationally
> neglecting [plaintiffs' child] because he 'ha[d] not
> been in school since February 13, 2018' and that a
> '[p]arent ha[d] not engaged in communication with
> school and a '[p]arent ha[d] been difficult to work
> with at IEP mtgs. Last meeting was February 13th.'
>
> Id at *2-3.

Plaintiffs further alleged that the defendant knew and
intended that the Connecticut DCF would initiate child neglect

45

proceedings against the plaintiffs.  Id.  Initially DCF
substantiated the allegations and filed a neglect petition.  Id
at *3-4.  The next year, DCF withdrew their petition against the
plaintiffs.  Id.  Plaintiffs claimed, among other things, that
the ordeal had caused substantial expense, "great and prolonged
fear, anguish, sleeplessness, loss of appetite, and other
aspects of severe emotional distress."  Id at *4.

In granting summary judgment in favor of the defendant on
an IIED claim, the Court first determined that the defendant was
entitled to statutory immunity, but that, even if the defendant
were not, the conduct was not sufficiently extreme and
outrageous.  Id at *18-19.  The Court reasoned that:

> [a]s a mandated reporter, the defendant was obligated
> to make a report *if she had reasonable cause to
> suspect neglect*, and she did so pursuant to [the
> mandated reporter statute].  DCF substantiated those
> allegations. Because the defendant acted pursuant to a
> statutory duty and the plaintiff has failed to provide
> evidence to raise a genuine issue of material fact
> that the defendant knowingly reported false
> information, or her allegations were otherwise
> unsubstantiated, the court cannot conclude that her
> conduct rose to the level of "extreme and outrageous."

> Id at *20 (emphasis added).

Here, Dr. Newton was acting pursuant to *both* a statutory
duty to report to DCF if she had "reasonable cause" to believe
that G.H. was suffering physical or emotional injury, M.G.L. c.
119, § 51A(a), as well as her professional responsibilities as
Director of the MGH Child Protection Team.  Against that

46

backdrop, Plaintiffs simply have not adduced enough evidence to
create a triable issue of fact as to whether Dr. Newton's
alleged conduct was extreme and outrageous.  Indeed, although
dealing with Dr. Newton's allegations may have constituted an
"indignity[y]" to Plaintiffs, Foley, 400 Mass. at 99, there is
insufficient evidence in the record for a reasonable jury to
find that that Dr. Newton's conduct was characterized by "a high
order of reckless ruthlessness or deliberate malevolence that .
. . is simply intolerable." McCormick, 539 F. Supp. 3d
at 244.

It is not "utterly intolerable" in a "civilized community"
for medical professionals that specialize in child protection to
make reasonable claims of neglect, even if they are later found
by DCF to be unsubstantiated.  See Agis, 371 Mass. at 144-145.
Notably, Plaintiffs have not submitted any evidence of Dr.
Newton acting in a personal capacity.  Just because Dr. Newton
may have been incorrect in one or more of her medical
assessments does not mean that her conduct, all of which
occurred in the ordinary course of her employment, was extreme
and outrageous.  Cf. Eaddy v. Dep't of Children & Families, No.
HHDCV106013363S, 2012 Conn. Super. LEXIS 2949, at *5 (Super. Ct.
Dec. 5, 2012) ("[p]laintiff has, at most, alleged that the
school defendants made a wrong decision to report her son's
situation to DCF. That is obviously not extreme and outrageous

conduct...").  Accordingly, the Court finds that neither J.S.H. nor G.H. has created a triable issue of fact with respect to the extreme and outrageous requirement.

### B. The Allegedly Severe Emotional Distress[15]

To provide sufficient evidence that their alleged emotional distress is severe for purposes of their IIED claims, J.S.H. and G.H. "must show that [they] suffered the kind of distress that no reasonable [person] could be expected to endure." Miller v. Pugliese, 693 F. Supp. 3d 163, 184 (D. Mass. 2023) (internal quotation marks and citations omitted).  To be sure, a "plaintiff cannot prevail with mere emotional responses including anger, sadness, anxiety, and distress."  Id. (internal quotation marks and citations omitted).

In the IIED section of their summary judgment briefing, Plaintiffs did not directly address the issue of whether they had met the severity requirement.  See [ECF No. 90 at 9-12]. However, it is clear to this Court that no reasonable jury could find that either J.S.H. or G.H. experienced severe emotional distress relative to the IIED claims.  As discussed at greater length *supra*, J.S.H. indicated in an interrogatory response that she was claiming only "garden variety" emotional distress; an

---

[15] The Court incorporates by references its emotional distress-related findings relative to both J.S.H. and G.H. *supra*, but will also make a couple of additional observations relative to the emotional distress requirement for the IIED claims.

admission that this Court takes to mean that she was necessarily
not claiming "severe" emotional distress.  Cf. Baker v. Echostar
Communs. Corp., Civil Action No. 06-cv-01103-PSF-BNB, 2007 U.S.
Dist. LEXIS 89111, at *39 (D. Colo. Dec. 4, 2007) ("plaintiff
has taken the position...that certain medical records should not
be admitted at trial because the emotional distress she is
intending to prove is 'garden variety' emotional
distress...plaintiff is in effect withdrawing, or at least
impeding defendant from challenging, the fact issue of whether
she suffered *severe emotional distress*") (emphasis added).

In addition to the fact that neither J.S.H. nor G.H. did
not provide *any* expert medical evidence regarding their
allegedly severe emotional distress, the only evidence of
J.S.H.'s allegedly severe emotional distress comes from her
untimely affidavit.  The only evidence of G.H.'s allegedly
severe emotional distress stems from allegation from 2013, which
is thus time-barred.

Accordingly, this evidence is insufficient for a reasonable
jury to find the severe emotional distress required to prove
either G.H.'s or J.S.H.'s IIED claims.

### i.   **Conclusion – Counts IV and VIII**

For all of these reasons, Dr. Newton's motions for summary
judgment as to Count IV and Count VIII are **GRANTED**. Moreover,
given the Court's conclusion relative to these claims, it need

not and will not reach the merits of Dr. Newton's statutory immunity argument.

**VII.  <u>Conclusion</u>**

 For the foregoing reasons, MGH's summary judgment motion [ECF No.83] was **<u>GRANTED</u>** and Dr. Newton's summary judgment motion [ECF No. 82] was **<u>GRANTED</u>**.

 **SO ORDERED.**

Dated: February 7, 2025

<u>/s/ Margaret R. Guzman</u><br>
MARGARET R. GUZMAN<br>
United States<br>
District Judge